**Joseph LYDON, Plaintiff, Appellant,**

v.

**BOSTON SAND & GRAVEL COMPANY, Defendant, Appellee.**

**No. 98–1978.**

United States Court of Appeals, First Circuit.

Heard Feb. 2, 1999.

Decided April 9, 1999.

---

**8**

James T. Masteralexis, for appellant.

Robert P. Corcoran, with whom Gleeson & Corcoran was on brief, for appellee.

Before SELYA and STAHL, Circuit Judges, and SHADUR,* Senior District Judge.

SHADUR, Senior District Judge.

This labor dispute presents a collision at the intersection of judicial doctrines that in this instance would operate at cross-purposes: on the one hand the doctrine of complete federal preemption, and on the other hand both the limitations on that doctrine and the independent principle of judicial estoppel. Appellant Joseph Lydon ("Lydon") has sought to resolve his quarrel with his employer, appellee Boston Sand and Gravel Co. ("Boston Sand"), in two successive forums: first by an attempted arbitration between Lydon's union and Boston Sand pursuant to their collective bargaining agreement ("CBA"), and then by Lydon's lawsuit in a Massachusetts state court pursuant to that state's workers' compensation laws.

When Lydon initially filed his grievance under the CBA, leading in turn to the union's invocation of the arbitration remedy, Boston Sand successfully argued before the arbitrator that the parties had already agreed his claims should instead be decided under state statutes. When Lydon then did file suit in a state court, Boston Sand removed the case to federal court, urging that Lydon's state law claims were preempted by federal labor laws.

Finding that the state law claims were indeed preempted, the district court entered a summary judgment of dismissal in favor of Boston Sand. For the reasons stated in this opinion, we hold that while Lydon's claims might ordinarily be preempted, they are not preempted here because of Boston Sand's prior litigating position. We therefore remand this case to the district court with a direction that it be remanded to the state court of origin.

### Facts

Boston Sand hired Lydon as a cement truck driver in 1984. In July 1991 Lydon suffered a work-related neck injury that prevented him from working. He received weekly workers' compensation payments until May 1993, when he settled his claim and received a lump sum payment that was projected to cover four years of weekly payments based on Lydon's expected period of disability.

During those four years Lydon was presumed as a matter of Massachusetts law (Mass.Gen.L. ch. 152, § 148) to be unable to work. Nonetheless Lydon did some driving for another concrete company, Sherman Concrete, from fall 1993 to spring 1995.

* Of the Northern District of Illinois, sitting by designation.

In April 1995 Lydon attempted to return to work for Boston Sand. After a physician determined that he was physically able to do so, Lydon met with Vice President David McNeil ("McNeil") and attempted to substantiate his physical ability to return to work by noting his interim job with Sherman Concrete. McNeil informed Lydon that because he had worked for another company for a year and a half, Boston Sand considered Lydon to have quit his job and forfeited his seniority rights. Lydon's union, Teamsters Local 379, then presented a written request for Lydon's reinstatement, which Boston Sand denied.

That request led to an exchange of letters between the union's attorneys and Boston Sand's attorneys. In December 1995 union attorney Paul Kelly ("Kelly") wrote to Boston Sand attorney Robert Corcoran ("Corcoran") that a worker who received a lump sum settlement and was absent from work because of the state statutory presumption of incapacity, but who then wished to return to work, had no remedy under the CBA and that such a claim can arise only under statutory law. Corcoran responded the following month by agreeing with Kelly's assessment but taking it a step further, stating:

> It is Boston Sand's position that an injured worker claiming a right of reinstatement following a lump sum settlement can assert such a claim only in court under the statute, and not as a grievance under the contract.

Kelly confirmed a few weeks later by writing back that the union was in agreement that "the reinstatement rights of workers who enter into lump sum agreements are not covered by the collective bargaining agreement and, as such, must be asserted in judicial proceedings."

After the May 1997 expiration of the four-year statutory presumption of Lydon's incapacity to work, his private attorney threatened to sue Boston Sand under the state workers' compensation statute. That threat led to negotiations that resulted in Lydon's returning to work on August 11, 1997, but with seniority preference only over those hired in or after July 1997. That minimal preference left Lydon significantly farther down on the seniority list—with an accompanying loss of benefits—than he would have been if he had been reinstated with the seniority rights of his original 1984 date of hire.

On August 17, 1997 the union filed a grievance against Boston Sand, claiming that its refusal to grant Lydon seniority based on his 1984 date of hire violated the CBA. That grievance proceeded to arbitration, where the arbitrator held that the dispute was not arbitrable because the parties had previously agreed (in the already-described 1995–96 exchange of letters) that reinstatement rights, which the arbitrator determined included both rehiring and seniority, were not covered by the CBA and could be enforced only under state statutes. In the face of the explicit references to "reinstatement rights" in the letters, the arbitrator rejected Lydon's argument that the 1995–96 agreement covered only rehiring and not seniority. Further, the arbitrator agreed substantively with the parties' exchange of letters in finding that the CBA did not at all address the rights of workers who received lump sump settlements, so that it could not be considered inconsistent with the state statute.

Lydon then filed a civil suit in Massachusetts state court, claiming that Boston Sand violated Mass. Gen. L. ch. 152, §§ 75A and 75B [1] because it discriminated against him by failing to reinstate his original seniority rights when he started back to work. As stated earlier, Boston Sand removed the suit to federal court on the predicate that the state law claims were

---

1. We hereafter refer to the state statutory provisions as "Section—," omitting the chapter number. Those numbers differ sufficiently from the numbering of the federal statute referred to in the next sentence of the text so that the dual usage of "Section—" creates no confusion.

preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("Section 301").

Lydon's appeal disputes the district court's entry of summary judgment in favor of Boston Sand on that ground. As always, our review of the district court's award of summary judgment is de novo (*Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir.1996)).

### Preemption Doctrine

█ Certain aspects of federal labor law have long been construed to preempt the field—they not only provide for federal jurisdiction over contract disputes but also prohibit certain state law actions in the same subject area. In the labor law context, the statutory foundation for such complete preemption is found in Section 301(a):

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

From those simple words, a complex preemption jurisprudence has grown in stages. Initially state courts were simply prevented from applying local rather than federal law in deciding contract disputes about CBAs (see *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)), but then the doctrine was extended to preempt state law remedies whenever resolution of a plaintiff's claim is substantially dependent on analysis of a CBA's terms (*Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)). Such preemption is necessary, according to the Supreme Court, to retain consistency in the interpretation of terms common to CBAs and to prevent parties from relabeling as state law claims their actions that in actu-

ality arise under a CBA (*see, e.g., Livadas v. Bradshaw*, 512 U.S. 107, 122–23, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)).

█ Nonetheless the doctrine does not preclude all state law claims that are somehow linked to a labor dispute. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) (emphasis added) states the test for determining whether a particular state remedy has been preempted by federal law:

> [I]f the resolution of a state-law claim *depends upon the meaning of a collective-bargaining agreement*, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute.

Mere parallelism between a state law claim and a federal contract claim does not necessarily require state court interpretation of the CBA—that is, as long as the state claim can be resolved without construing the agreement itself, it is not preempted by Section 301 (*id.* at 409–10, 108 S.Ct. 1877). Furthermore, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished" (*Livadas*, 512 U.S. at 124, 114 S.Ct. 2068, citing and thereafter quoting from *Lingle*, 486 U.S. at 413 n. 12, 108 S.Ct. 1877).

█ Courts confronted with state law claims must therefore locate the line between the need for mere consultation of a CBA, which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims. As we have said of that dichotomy, "[o]ur premise is that this means a *real* interpretive dispute" (*Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir.1997) (emphasis in original)). Our task here, then, is to determine the

extent to which the analysis of Lydon's state causes of action under Sections 75A and 75B is dependent on the CBA.

We have twice before addressed the preemptive effect of federal labor law over those same state provisions. In *Martin*, 105 F.3d at 44 we found both Sections 75A and 75B preempted by federal labor law, and in *Magerer v. John Sexton & Co.*, 912 F.2d 525, 529–30 (1st Cir.1990) we found Section 75B preempted. Both cases found the claims preempted because of a proviso present in each statutory section:

> In the event that any right set forth in this section is inconsistent with an applicable collective bargaining agreement, such agreement will prevail.[2]

*Martin*, 105 F.3d at 44 and *Magerer*, 912 F.2d at 529 reasoned that the quoted provision required courts to interpret the relevant CBA to determine whether it was inconsistent with the state statute. So even if the state cause of action did not itself require the court to construe the CBA, the inconsistency clauses of the state statutes would require such interpretation. Thus, for example, Martin's state claims were held preempted "not because the collective bargaining agreement *is* inconsistent with the state claims asserted, but because it *may* be so and requires interpretation" (*Martin*, 105 F.3d at 44 (emphasis in original)). *Martin* recognized that its analysis would result in preemption of Section 75A and 75B claims in some troubling cases that would not otherwise be precluded (*id.*). But it went on to observe that either the legislature or the unions could avoid that problem by modifying the statutes or the CBAs (*id.*)—neither of which occurred in this case. Accordingly, Boston Sand urges this Court to follow the rationale of *Martin* and *Magerer* and to find Lydon's claims preempted as well.

■ Matters are not so easy as Boston Sand would have it, for this case presents an interesting twist to the preemption analysis: Here the arbitrator chosen by the parties has already held—pointing expressly to Boston Sand's attorney Corcoran's letter taking that position—that the parties had agreed in 1995–96 that the CBA did not apply to (indeed, did not even attempt to address) Lydon's claims. Furthermore, the arbitrator (on whom the parties have conferred the authority to interpret the CBA) found that because the CBA did not purport to cover reinstatement of workers who received lump sum settlements for a workers' compensation claim, the CBA and the statute could not be inconsistent.

With that conclusion having been arrived at pursuant to the parties' agreement, neither the district court nor we have any occasion to interpret the CBA or the parties' 1995–96 letter-based agreement to determine the already-resolved question of whether the state statutory remedies are consistent or inconsistent with those provided in the CBA. That determination has already been made—first by the parties, then by the arbitrator. Neither *Martin* nor *Magerer* requires us to find Lydon's claims preempted.

Boston Sand further argues, however, that the substance of Lydon's discrimination claims would require more than mere reference to the CBA. It argues that resolution of the state law claims would require both reliance on a duty created by the CBA and interpretation of the CBA's seniority provisions. In an effort to support that contention, Boston Sand cites *Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir.1997):

> A state-law claim can "depend" on the "meaning" of a collective bargaining agreement in two ways. First, a claim so qualifies if it alleges conduct that arguably constitutes a breach of a duty that arises pursuant to a collective bargaining agreement. See *United Steelworkers v. Rawson*, 495 U.S. 362, 369, 110 S.Ct. 1904, 109 L.Ed.2d 362

---

**2.** That quoted language is from Section 75B(3). Though the proviso in Section 75A is

worded a bit differently, its substance is the same.

(1990)("[A] state-law tort action against an employer may be pre-empted by § 301 if the duty to the employee of which the tort is a violation is created by a collective-bargaining agreement and without existence independent of the agreement."). Second, a claim so qualifies if its resolution arguably hinges upon an interpretation of the collective bargaining agreement. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) (finding section 301 preemption "when resolution of a state-law claim is substantially dependent upon analysis of the term of an agreement made between the parties in a labor contract"). If a state-law claim depends on the meaning of the collective bargaining agreement in either of these ways—that is, under *Rawson*'s "duty" rubric or under *Allis–Chalmers*'s "interpretation" rubric—it is preempted.

Boston Sand's position seeks to draw force from the first of those alternatives and the notion that seniority rights typically stem from a CBA. But again the situation before us differs materially from that norm, because Boston Sand has previously agreed with the union as Lydon's representative that the CBA did *not* address the statutory workers' compensation issues—that only the state statute does that and defines Lydon's rights—and because the arbitrator found that agreement (including the consequent rights that define Lydon's place in the workforce) binding.

Indeed, the parties' express agreement that the CBA does not cover their dispute operates here just as any stipulation about any other legal issue in a case would. For example, had the parties stipulated in 1995 to a definition of seniority rights without reference to the preexisting CBA, that stipulation would continue to bind them at

this stage of the proceedings. Neither party could now attempt to rely on a different definition of the term. In the same way, both sides here have agreed that the CBA did not even address the issues at stake between them. Just so, one party—Boston Sand—cannot now renege on its agreement in an effort to avoid answering the other's state law claims.

We therefore reject the notion that Lydon's claims are preempted by Section 301. Indeed, that outcome is fortified (independently, in a way) by a concept that has already been implicated somewhat in our analysis and that we will now discuss in more detail: the doctrine of judicial estoppel.

### Judicial Estoppel

Judicial estoppel "precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another" (*Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir.1987)). That doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies (*id.* at 214). Indeed, "[i]f parties feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer" (*id.*). According to *Patriot Cinemas, id.* at 212 (internal quotation marks and citations omitted), the doctrine "should be employed when a litigant is playing fast and loose with the courts, and when intentional self-contradiction is being used as a means of obtaining unfair advantage." Although the doctrine varies somewhat among states and among federal circuits (18 James W. Moore et al. (Lawrence B. Solum, ed.), *Moore's Federal Practice* § 134.30, at 134–62 to –63 (3d ed.1998)),[3]

---

**3.** Because this case invokes federal subject matter jurisdiction on federal question grounds (*see Avco Corp. v. Aero Lodge No. 735,* 390 U.S. 557, 560, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)), no *Erie* question arises and the federal law of judicial estoppel applies (*Patri-*

*ot Cinemas,* 834 F.2d at 215). In any event, Massachusetts judicial estoppel principles do not vary significantly from those that we apply (compare *id.* at 211–15 with *Fay v. FNMA,* 419 Mass. 782, 788, 647 N.E.2d 422, 426 (1995)).

our application of the doctrine requires that the party being estopped have succeeded previously with a position directly inconsistent with the one it currently espouses (*see Gens v. RTC*, 112 F.3d 569, 572 (1st Cir.1997), quoting *Patriot Cinemas*, 834 F.2d at 212; *see also Casas Office Mach., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 676 (1st Cir.1994)).

Lydon urges that judicial estoppel principles should prevent Boston Sand from arguing here that federal law is Lydon's exclusive remedy. As he points out, at the arbitration proceeding Boston Sand succeeded with precisely the opposite argument—that the parties had already agreed that state law provided Lydon's exclusive remedy and that the CBA did not address the issue.

Boston Sand's inconsistency is both patently unfair to Lydon and destructive to the integrity of the judicial system. Boston Sand should not be allowed to argue successfully in each of two potential forums that Lydon's claims should be heard in the other, thereby depriving Lydon of any tribunal in which to bring his action. Not only does that strategy place Lydon at an unfair disadvantage and force him to embrace inconsistent arguments,[4] but also it erodes the credibility of the court system and the efficacy of private arbitration agreements. If parties are allowed to argue one position to get out of arbitration and then to argue the exact opposite to avoid related court battles, the value of arbitrators as decisionmakers (a value that has repeatedly been stressed by the Supreme Court, particularly in the context of labor matters) will be vitiated.

Here Lydon filed his suit in state court in direct reliance on Boston Sand's assertions—both in the 1995–96 exchange of letters and in its arguments before the arbitrator—that it viewed the state court as the appropriate forum for the dispute. We therefore also draw upon the judicial estoppel doctrine in holding that Boston Sand cannot be permitted to circumvent its earlier agreement with Lydon that the existing dispute should be resolved in the state courts under the state statutes (while we express no substantive view, of course, on the merits of the state law claims). That doctrine operates, independently of the earlier discussion in this opinion, to hold Boston Sand to its own and the arbitrator's conclusions that Lydon must present his claims in state court and that the CBA does not purport to cover the disputed issue.

### *Subject Matter Jurisdiction*

We recognize that there is something troubling about the conclusion that we have announced. After all, if it had not been for the parties' 1995–96 agreement and the ensuing arbitration decision confirming that agreement, the traditional *Lingle* analysis would most likely have triggered federal preemption of Lydon's claims. That is so because the merits of Lydon's state claims could otherwise have required interpretation of the CBA. For example, assessing whether Lydon faced adverse employment action—one of the necessary elements of his discrimination claim (see *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662, 672 N.E.2d 1, 7 (1996))—might well have required interpretation of the CBA to determine whether Boston Sand had a duty to grant Lydon the benefit of his original seniority.

If in other circumstances the *Lingle* line of cases could thus lead to preemption of Lydon's claims, the question is whether the parties should be able in a

---

4. Boston Sand has asserted that *Lydon* was precluded by judicial estoppel principles from arguing here that the state statute provides a remedy for loss of seniority rights because his union had contended at the arbitration proceedings that the workers' compensation statute did not address Lydon's post-rehiring rights. But the merits of Lydon's state law claims are not relevant here. Lydon simply did what Boston Sand said (and what the arbitrator held) that he must do: He filed in the state court. Judicial estoppel certainly does not prevent Lydon from defending against Boston Sand's subsequent removal of that action to federal court.

sense to contract out of federal jurisdiction by agreeing that the CBA is not implicated in the case. This is not a situation involving state-federal concurrent jurisdiction, where parties often forgo potential federal jurisdiction by the plaintiff choosing to sue in a state court and by the defendant simply not removing the case to a federal court. By contrast, in the field occupied by Section 301 (broadly construed), Congress and the Supreme Court have determined that the federal courts should have exclusive jurisdiction. Not only have they conferred jurisdiction over such claims on the federal courts, but they have also prohibited state courts from hearing them. Indeed, for that very reason courts have been cautioned to give careful consideration to the application of judicial estoppel when subject matter jurisdiction is at stake (18 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4477, at 784 (1981 & 1998 supp.)).

But those concerns do not apply here. What the parties agreed to in prior proceedings—and what the arbitrator relied on in coming to his decision that the dispute was not arbitrable—was that the CBA simply did not address the seniority rights of workers returning to work after lump sum workers' compensation settlements. Thus the parties agreed (and the arbitrator held) that there would be no need for a state court to interpret the CBA, because it would find nothing relevant to interpret in that agreement. Or to phrase the matter a bit differently, it is the Massachusetts statutes and *not* the CBA that have been agreed by the parties to define Lydon's rights of priority vis-a-vis other employees.

In fact, any determination that would question the result here on subject matter jurisdictional grounds would be at odds with circuit precedent. In *Sweeney v. Westvaco Co.*, 926 F.2d 29, 37–41 (1st Cir. 1991) we determined "that LMRA § 301 preemption ... concerns what *law* a decision maker must apply, not what *forum* must decide the dispute" (*id.* at 39, emphasis in original), so that the preemption doctrine did not impose a limitation on federal courts' subject matter jurisdiction. If as we held in *Sweeney* Section 301 preemption is a waivable defense, it really follows a fortiori that a litigant such as Boston Sand, which has not merely failed to assert (that is, has not simply waived) the issue but has actively (and successfully) advanced a position taking the issue out of the ambit of Section 301, could not now contest subject matter jurisdiction here.

Simply put, Lydon is not stripped of his capacity to bring his claims in state court by Section 301 preemption, because it has been definitively established as between the parties that there is no need to interpret the CBA to assess those claims. That is what the parties have agreed to, that is what the arbitrator found, and that is what we rely on in finding there is no Section 301 preemption.

### Conclusion

We remand this case to the district court with directions to remand the case to the Superior Court of Massachusetts, Suffolk County. *It is so ordered.* In so doing, we express no views on the substantive merits of Lydon's claims.