**Eleanor C. SCHOCK, Plaintiff,**

**v.**

**UNITED STATES of America and Federal Deposit Insurance Corporation, in its capacity as Receiver of Old Stone Bank FSB, Defendants.**

No. 97–530L.

United States District Court,
D. Rhode Island.

July 16, 1999.

See also, 21 F.Supp.2d 115.

John D. Deacon, Medeiros, Karman & Sanford Inc., Providence, RI, for Plaintiff.

Robin Feder, Assistant U.S. Attorney, Providence, RI, Joseph F. Shea, Nutter, McClennen & Fish, LLP, Boston, MA, David J. Lawson, Partidge, Snow & Hahn, Providence, RI., Scott Birdwell, Federal Deposit Ins. Corp., Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This case arises from the villainy of Attorney Pat Nero, who looted the Estate of his client Ragnar Miller in 1993. Eleanor Schock ("Schock"), Miller's daughter and only heir, is pursuing $23,331.72 as the assignee of the Estate's claims. Here, she has sued the United States and the Federal Deposit Insurance Corporation ("FDIC") because the bank accounts into which Nero dipped were held by a bank being run by the FDIC as conservator.[1] That bank, Old Stone Federal Savings Bank ("New Old Stone"), was a successor to Old Stone Bank, a Federal Savings Bank ("Original Old Stone"), that had been closed by the FDIC on January 29, 1993. New Old Stone was liquidated in turn July 8, 1994.

Most of the facts of this case were outlined in an earlier opinion and need not be reiterated here. *See Schock v. United States,* 21 F.Supp.2d 115, 117 (D.R.I.1998)

---

1. The Resolution Trust Corporation ("RTC") was the entity that took over Old Stone Bank. The FDIC is the RTC's statutory successor. *See* 12 U.S.C. § 1441a(m)(1).

(*hereinafter Schock I*). Schock's core grievance is that she believes New Old Stone should not have given the money in Miller's bank account to Nero.[2] Plaintiff's Amended Complaint alleges three counts: Count I is against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674 (the "FTCA"), nominally for conversion;[3] Count II is against the FDIC ("FDIC–Receiver") as conservator of New Old Stone and operator of the bank on August 27, 1993 for breach of contract; and Count IV is against the United States under the FTCA for negligence.[4]

This case is now before this Court on two motions. The United States moves for summary judgment on Counts I and IV, suggesting three distinct arguments that would preclude plaintiff's recovery. This Court considers each at length below, but in sum, the motion is granted as to Count I and denied as to Count IV. *See* Sections II, III & IV, *infra.*

Schock renews her motion for summary judgment as to Count II against FDIC–Receiver. She asks this Court to reconsider its prior legal ruling and offers new evidence. Neither tack succeeds, and the motion is denied. *See* Section V, *infra.*

### I. *Legal standard*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" *Morrissey v. Boston Five Cents Sav. Bank,* 54 F.3d 27, 31 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 106 (1st Cir.1997). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.,* 777 F.Supp. 167, 169 (D.R.I. 1991).

### II. *"Government Employee" Under the FTCA*

The United States may succeed at trial on Counts I and IV by proving that the people who allowed Nero to withdraw the money were not government employees.

---

**2.** At its most basic, Schock's claim is that Ragnar Miller deposited $23,331.72 with Old Stone Bank and that the bank did not return it. Nero withdrew $23,331.72 from Miller's account on August 27, 1993, and deposited that money in his own account. This claim turns on the legal significance of the bank's action, i.e., whether it provided Miller's money to his apparent agent Nero. If it did, the bank fulfilled its obligation; if not, then the bank essentially gave Miller's money to a stranger and owes $23,331.72 to Schock. *See Schock I,* 21 F.Supp.2d at 121.

**3.** The exact cause of action is disputed, and it is crucial to this motion. *See* Section IV(B), *infra.*

**4.** This Court dismissed Count III against the FDIC ("FDIC–Corporate") as the insurer of New Old Stone's deposits. *See Schock I,* 21 F.Supp.2d at 123–34.

The FTCA only apples where there is negligence by an employee of the government. *See* 28 U.S.C. § 1346(b)(1). The United States argues that the women at issue, Judy Polanco and Kerry D'Ambra, were employees of New Old Stone, the newly-chartered entity that succeeded Original Old Stone. Although there does not appear to be a dispute that these people were employed by New Old Stone, there remains a genuine dispute as to whether that made them employees of the United States under the FTCA.

The Supreme Court suggests that when the FDIC takes over a bank, it steps into the bank's shoes as a matter of law. *See O'Melveny & Myers v. FDIC,* 512 U.S. 79, 85–86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). However, that does not shed light on whether the bank—when it is run by the FDIC—becomes a part of the U.S. government as well. Neither the United States nor this Court can find authority that holds that Old Stone Bank was not a federal agency under the FTCA.

### A. *Defining Employee*

The FTCA defines an "employee of the government" to "include officers or employees of any federal agency." 28 U.S.C. § 2671. Federal agencies include "corporations primarily acting as instrumentalities or agencies of the United States." Id.

Many courts have wrestled with the issue of whether individuals can be regarded as employees of the government, *see, e.g., Larsen v. Empresas El Yunque, Inc.,* 812 F.2d 14, 14–16 (1st Cir.1986) (comparing government employee with independent contractor); *Miller v. George Arpin & Sons, Inc.,* 949 F.Supp. 961, 965–66 (D.R.I. 1997) (same), and whether they acted in the scope of their employment, *see, e.g., Attallah v. United States,* 955 F.2d 776, 782 (1st Cir.1992) (discussing scope of employment). *See also* cases collected in Reply to P.'s Obj. to United States of America's Mot. For Summ. J. at 3–5. However, this Court finds no precedent to suggest how the First Circuit would decide wheth-er New Old Stone was a corporation acting primarily as an instrumentality of the United States. This Court must rely on the plain language of the statute.

### B. *Applied to this Case*

■ The United States offers affidavits from employees of New Old Stone and of the FDIC. FDIC employee Sally McCormick, who was director of operations for the RTC in 1993, said that employees of New Old Stone were not employees of the RTC. She emphasized that the RTC, which was a predecessor to the FDIC, created New Old Stone as a new institution.

In opposition, Schock points to interrogatory answers filed in this case in which the FDIC–Receiver says that New Old Stone and the RTC were a single entity and that New Old Stone's employees were supervised by the RTC under RTC rules. The language is so blunt that, when this Court awards all inferences to Schock, the FDIC–Receiver appears to be saying that the bank's employees were RTC employees. First, the FDIC–Receiver repeated at least four times in its answers that:

> There is no distinction between the entity Plaintiff defines as "New Old Stone Bank," on the one hand, and the Resolution Trust Corporation, as Conservator of Old Stone Federal Savings Bank, on the other.

(Supplemental Responses of FDIC as Receiver of Old Stone Federal Savings Bank to P.'s Fourth Document Request and Third Set of Interrogatories to D.s at 2–4 (attached as Exhibit 8 to P.'s Obj to Mot. For Summ. J. by D. USA).) Second, the FDIC–Receiver said that:

> The Resolution Trust Corporation, as Conservator of Old Stone Federal Savings Bank, administered the work-related activities of employees of the Resolution Trust Corporation, as Conservator of Old Stone Federal Savings Bank, pursuant to policies and procedures of the Resolution Trust Corporation, as Con-

servator of Old Stone Federal Savings Bank.

(Id. at 3.)

■ Thus, there is a genuine dispute as to how New Old Stone was controlled and, therefore, how its employees were controlled. Generally, an institution controlled by the federal government would qualify as "a corporation primarily acting as an instrumentality of the United States." Specifically in this case, the FDIC–Receiver's answers to interrogatories create, at least, a genuine dispute about whether New Old Stone was a government agency or perhaps even part of the RTC. Without precedent or sufficient facts, this Court cannot decide the question. Therefore, this Court cannot grant summary judgment to the United States on this issue.

To be clear, this Court does not decide today whether, as a matter of law, a bank under receivership qualifies as a "government agency" under the FTCA. Nor does it decide factually whether New Old Stone was .a government agency. Those questions will have to be answered after a full evidentiary hearing and after complete briefing by the parties.

III. *The Statute of Limitations*

■ The United States seeks summary judgment on Counts I and IV on the ground that the FTCA statute of limitations applies. This Court has already held previously that the discovery rule applies in this case. See *Schock I,* 21 F.Supp.2d at 119. In order for the statute of limitations to be tolled, the factual basis for the cause of action must have been inherently unknowable at the time of the injury. *See Attallah,* 955 F.2d at 780; *Tagliente v. Himmer,* 949 F.2d 1, 4 (1st Cir.1991). The action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action. *See United States v. Kubrick,* 444 U.S. 111, 121–25, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Attallah,* 955

F.2d at 780. This is an objective test. *See Schock I,* 21 F.Supp.2d at 119.

■ As discussed in *Schock I,* the issue before this Court is whether the discovery rule tolled the statute of limitations past July 2, 1995. The question boils down to whether Schock had a triggering warning that something was wrong and the ability to discover the injury with reasonable diligence. In its motion, the United States provides an admirable amount of evidence that Schock recognized Nero as a scoundrel before that date. She knew on October 28, 1993 that Nero had engineered his appointment as Executor of the Estate, and she filed a complaint with the Rhode Island Supreme Court Disciplinary Board on April 25, 1995 that alleged that Nero had committed fraud, (*see* Exhibit C to the United States' motion).

At trial, that evidence may suffice to show that Schock had been warned before July 2, 1995. However, this Court must draw all inferences to the benefit of Schock at this stage of the proceedings. At this point, this Court can only conclude that there is a genuine dispute over material facts—both as to whether Schock received a triggering warning and as to whether she had the ability to discover the injury. That dispute precludes summary judgment.

First, Schock argues that she did not have sufficient knowledge of Nero's theft to qualify as a warning until November 1995 when a probate judge told her about a criminal investigation. She says her April 1995 letter did not allege embezzlement, and on summary judgment, this Court infers that her complaint to the Disciplinary Board was merely over Nero's effort to be named Executor and the delays that he caused in the Probate Court. There is a difference between warnings that Nero was shady and that he was a thief. Second, Schock argues that she did not have access to the Estate's financial records. When the March 1993 Will was admitted to probate, Schock argues that she only had standing to challenge the will,

not to compel an inventory or examine the assets. Schock said that she had no way of knowing that the Estate owned accounts at Old Stone Bank or that Nero had embezzled from them. In the absence of evidence proving that those allegations are false, the facts support this plausible inference.

Therefore, the statute of limitations will not provide the United States with summary judgment, although it is equally clear that Schock has not proved that the statute of limitations must be tolled. To repeat, it is unsettled what the triggering warning might have been. Federal law controls, and at trial, this Court will look to the First Circuit precedents, including the cases listed in *Schock I,* to decide whether Schock suffered from "blameless ignorance." *Kubrick,* 444 U.S. at 120 n. 7, 100 S.Ct. 352. *See also Schock I,* 21 F. Supp.2d at 119 (collecting cases and outlining the standard).

## IV. *Tort Liability Under Rhode Island Law*

Counts I and IV are framed as claims under the FTCA respectively for conversion and negligence. The United States argues that the claims fundamentally sound in contract, not in tort. As a matter of law, the United States misreads current Rhode Island law. In this litigation, however, Schock assured this Court last year that the claim in Count I is based on contract, not conversion. She cannot twist her arguments to avoid the consequences of such a decision now.

### A. *Negligent Performance and Count IV*

█ The FTCA provides this Court with jurisdiction in cases brought against the United States on claims:

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.

28 U.S.C. § 1346(b)(1). Many courts—including several cited by the United States—have discussed that claims framed in tort could be fundamentally based on breach of contract. *See, e.g., City Nat'l Bank v. United States,* 907 F.2d 536, 546 n. 9 (5th Cir.1990); *Blanchard v. St. Paul Fire & Marine Ins. Co.,* 341 F.2d 351, 357–8 (5th Cir.1965); *United States v. Smith,* 324 F.2d 622, 625 (5th Cir.1963); *Woodbury v. United States,* 313 F.2d 291, 295 (9th Cir.1963). Those courts considered whether those plaintiffs hid their claims like a wolf in sheep's clothing to qualify under the FTCA. In this case, the United States argues that Schock has a contract claim, so she "should not be permitted to transform a classic contract dispute into a tort action." (Am. Mem. in Supp. of D. United States of America's Mot. For Summ. J. at 23.)

█ Rhode Island disagrees. The Rhode Island Supreme Court has clearly held that the negligent performance of a contractual duty can give rise to tort liability for negligence as well as liability for breach of contract. *See Davis v. New England Pest Control Co.,* 576 A.2d 1240, 1242 (R.I.1990). Thus, the debtor-creditor relationship can create a contractual duty that becomes also a duty imposed by law. This rule sails against the main current of jurisprudence, but a state enjoys the power to chart its own course in the law of torts. The United States has explicitly waived immunity:

under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). *See also Soto v. United States,* 11 F.3d 15, 17 (1st Cir.1993) (whether the act is tortious is governed by the law of the state in which the alleged tort was committed). Private defendants in Rhode Island can be liable in tort if they negligently perform their contractual duties. The United States can expect nothing less.

Therefore, Count IV states a negligence claim that this Court has the jurisdiction to hear under the FTCA. Thus, defendant's motion for summary judgment on that Count is denied.

## B. *Judicial Estoppel and Count I*

■ Count I, however, has a longer history. In both the original and amended complaints, Counts I and II make *identical* allegations. Count I outlines facts and alleges "conversion" by the United States. (*See* Second Am. Compl. at ¶ 16, First Am. Compl. at ¶ 16.) The two paragraphs that encompass Count II do *nothing* more than incorporate Count I and change the defendant: "FDIC, in its capacity as the Receiver of Old State Bank FSB, is liable to plaintiff as to the claim set forth in Count I." (*See* Second Am. Compl. at ¶ 18–19, First Am. Compl. at ¶ 18–19.)

During the arguments on the motions decided in *Schock I*, Schock and the FDIC disputed the characterization of Count II. FDIC argued for Rule 12(b)(6) dismissal because Schock had not alleged the elements of a conversion claim. Schock saved Count II by arguing—in both the briefs and during oral argument—that the claim was not for conversion even though the plain language appeared that way:

> The claim upon which Schock seeks a summary judgment against FDIC/Receiver is not for the tort of conversion. Rather, the claim is based upon the bank's obligation as debtor on the deposit account, an obligation which sounds in contract. *Westerly Community Credit Union v. Industrial Nat'l Bank*, 103 R.I. 662, 240 A.2d 586 (1968).

(P.'s Reply Mem. in Supp. of Mot. For Sum. J. on Count II, Against FDIC/Receiver at 1).[5] This Court relied upon this statement to find that Schock had a contract claim even though her complaint plainly called it "conversion." *See Schock I*, 21 F.Supp.2d at 120. In so doing, this Court gave Schock the benefit of the doubt, seeing the clear use of "conversion" to be an inadvertent mistake. This Court assumed that Schock had mistakenly added the sheep's clothing to Count II and recognized it as a lupine contract claim.

The doctrine of judicial estoppel forbids Schock from changing her story now and trying to herd Counts I and II back into the "tort claim" fold. The First Circuit has said:

> [I]ntentional self-contradiction should not be used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice. If such a tactic was attempted, the court was justified in acting to deny the unfair advantage. In this circuit, then, when a litigant is playing fast and loose with the courts, that party will be precluded from asserting a position inconsistent with a position he or she took in an earlier proceeding.

*United States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.1988) (citation omitted). *See also Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 12–13 (1st Cir.1999). In *Lydon*, the defendant had told an arbitration panel that state law controlled; therefore, it could not argue later in court that federal law controlled. *See Lydon*, 175 F.3d at 12–13. Normally, courts apply judicial estoppel by comparing contradictary claims made in different forums, but the doctrine is even more clearly applicable where a party contradicts herself in a single civil action.

Schock assured this Court that Count II was a contract claim. Like the defendant in *Lydon*, Schock reaped a benefit when the FDIC lost its motion to dismiss, and she is estopped from changing her mind. Counts I and II allege the identical facts with the identical words. The only differ-

5. Schock repeats the "sounds in contract" contention in a memorandum filed March 29, 1999. (*See* P.'s Reply Mem. in Supp. of Renewal of Mot. for Summ. J. Against FDIC/Receiver at 1.)

In that motion, Schock emphasizes the contractual nature of the claim in order to apply a statue of limitations that would be advantageous to her case. (*See id.* at 3–4.)

ence is the defendant against whom the claim is asserted. Therefore, the claims are identical. To extend the metaphor, Schock showed this Court that her allegation was a wolf and she now seeks to survive summary judgment by tucking that sheep's skin over the truth. This Court can recognize a wolf without checking the size of the eyes, ears and teeth. Judicial estoppel applies here, and its application cuts as cleanly as a woodman's ax. Schock must live with the consequences of swearing to this Court that she was pursuing contract claims.

■ Therefore, Count I is a contract claim, and this Court lacks jurisdiction because the FTCA does not apply to contract claims. Therefore, defendant's motion for summary judgment on Count I is granted.

## V. Schock's Renewal on Count II

This Court denied Schock's motion for summary judgment as to Count II in *Schock I*. Schock renews that motion, pleading with this Court to reverse its legal ruling and then supplying new facts to bolster its claim.

## A. The Law

■ Schock asks this Court to reconsider its decision that a principal's death does not terminate apparent authority by operation of law. This request, although unusual, was understandable, considering that the dearth of Rhode Island cases on this subject forced this Court to rely on learned treatises. *See Schock I*, 21 F.Supp.2d at 121–22. From the same treatise that this Court used, Schock quotes a passage that contradicts the *Schock I* holding. The significance of this issue is that Nero withdrew the money after Miller's death. The death ended actual agency, and the bank must rely on Nero's apparent authority—that the bank knew Nero to be Miller's agent in the past and relied on that when it gave him the money.

Schock is correct that a commentary in the Restatement (Second) of Agency says that apparent authority terminates with the death of the principal. *See* Restatement (Second) of Agency § 120 cmt. c (1958). However, this Court holds that apparent authority does not terminate on the death of the principal under Rhode Island law. The Rhode Island Supreme Court would look to the Restatement, but it would not adopt the illogical rule reported by Comment C that Schock quotes.

■ The Restatement is not precedent. A sentence in a Comment published in 1958 does not bind this Court in the fashion of a similar sentence from the First Circuit or Rhode Island Supreme Court. Instead, learned treatises are weighed along with Rhode Island court decisions, persuasive opinions by other state courts, and the public policy considerations identified in state decisional law. *See Blinzler v. Marriott Int'l Inc.*, 81 F.3d 1148, 1151 (1st Cir.1996).

■ The public policy for which the state created apparent agency would be eviscerated by adopting the rule that Schock promotes. The doctrine of apparent agency exists in order to allow third parties to depend on agents without investigating their agency before every single transaction. If a third party had to confirm the agency relationship repeatedly, then it might as well deal directly with the principal. Schock seeks to place the risk that a principal has died onto third parties, rather than on the principal. That is absurd.

■ Apparent authority exists where a principal manifests to a third party that the agent has the authority to contract on the principal's behalf. *See Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys. Inc.*, 539 A.2d 523, 526 (R.I.1988). The principal need not have direct communication with the third party. *See id.* The third party must merely have a reasonable belief that the agent has the authority to bind his principal. *See id.;*

*Petrone v. Davis,* 118 R.I. 261, 373 A.2d 485, 487 (1977).

■ That case law clearly manifests Rhode Island's support for the public policy that a third party can reasonably rely on a principal's annointing of an agent. The entire doctrine is based on promoting business and protecting a reasonable third party's reliance on agency. *See Menard,* 539 A.2d at 526; *Petrone,* 373 A.2d at 487–88. That public policy is bolstered by R.I. Gen. Laws § 18–4–16, which is at issue in this case. *See Schock I,* 21 F.Supp.2d at 122. The Restatement says that apparent authority exists until the third party has notice of its termination or has a manifestation that the principal no longer consents. *See* Restatement (Second) of Agency § 125. Schock wants death to be a special circumstance, but nothing suggests that Rhode Island would make such an illogical differentiation.

In other disputes over agency, the Rhode Island Supreme Court has applied a reasonableness test that promotes the operation of business at the risk of binding an unwilling principal. *See De Pasquale v. Societa De M.S. Maria,* 54 R.I. 399, 173 A. 623, 623–25 (1934). In *Pasquale,* a society was unable to take any formal action for its own protection because of a split among directors, so the administrative officers had the power to hire an attorney to protect the society. *See id.* The *Pasquale* Court held that an agent may take any action that he reasonably believes necessary to protect the principal when the agent cannot communicate with the principal. *See id.*

Even the Restatement that Schock quotes appears to undercut her argument. Commentary attached to other sections notes that termination of an agent's authority does not terminate his apparent authority. *See* Restatement (Second) of Agency § 125 cmt. a. And even more importantly, Comment A to § 120, which discusses policy considerations, contradicts the text of Comment C. Comment A notes that agency is a business rule and that the

risk of death is inherent in any agency relationship. *See* Restatement (Second) of Agency § 120 cmt. a. The common law rule that the Restatement reports in Comment C places the risk on the agent and third parties because the principal's estate would not be bound by a post-death deal. However, Comment A says that "[a]s between the risks to the estate and the harm to business which results from the common law rule, the protection of business is preferable." *Id.*

This Court concludes that the Rhode Island Supreme Court would agree. It would protect business and put the risk on the estate. Under Rhode Island law, apparent authority exists as long as the third party, to whom the principal has made a manifestation of authority, continues to reasonably believe that the agent is authorized.

Therefore, this Court reaffirms its *Schock I* holdings:

- R.I. Gen. Law § 18–4–16 protects third parties who in good faith pay or transfer money to an apparent agent.
- Apparent agency terminates when the third party has notice of the termination.
- Notice occurs when the third party knows, has reason to know, or has been given a notification of the occurrence of an event from which, if reasonable, he would draw the inference that the principal does not consent to have the agent so act for him.

*See Schock I,* 21 F.Supp.2d at 122. Because agency terminates at death, notice of a principal's death would make a reasonable person understand that the principal no longer consents to having the agent act for him.

B. *The New Facts.*

■ Schock offers certifications from herself and Karen D'Aillo, a former Old Stone Bank employee. D'Aillo reports that the bank had a procedure for checking the obituaries in The Providence Journal to see whether bank clients had died.

Schock says that an obituary for Miller appeared in that paper.

These facts go to the issue of whether FDIC–Receiver—in the form of the bank employees—had notice of Miller's death. To be plain, it is inconclusive evidence. To rule that FDIC–Receiver had actual notice of Miller's death from the obituary, this Court would have to infer that a bank employee read the item. Although Fed. R.Evid. 406 says that the routine practice of an organization is relevant to prove the conduct of an organization on a particular occasion, this Court would still have to infer that the bank followed its routine practice on the day Miller's obituary appeared. At the summary judgment stage, inferences are made *against* the moving party. Therefore, this Court infers that bank employees did not notice the obituary.

As with the factual issues pressed by the United States above, the bank's practices may be pivotal at trial, but they cannot support summary judgment at this time.

To focus the parties when they prepare pre-trial memoranda, this Court notes that it does not decide today what facts would constitute notice to the FDIC. The FDIC–Receiver assumes that a bank lacks notice where different employees know facts that would have alerted the bank to its customer's death if they had been pieced together. This Court does not decide that issue today, but it notes that FDIC–Receiver relies on a single mid-level appellate decision from Missouri, *General Ins. Co. of America v. Commerce Bank of St. Charles,* 505 S.W.2d 454 (Mo.App.1974). Whatever the precedential value of *General Insurance Company* in the Show Me State, that question appears open here in the Ocean State.

### Conclusion

For the foregoing reasons, this Court grants the United States' motion for summary judgment as to Count I and denies it as to Count IV. This Court denies Schock's renewal of her motion for summary judgment as to Count II.

Two counts remain in this case: Count II alleging a contract claim against the FDIC–Receiver and Count IV alleging a negligence claim against the United States under the FTCA. This dispute now appears poised for resolution by a bench trial.

It is so Ordered.