STATE OF MAINE
AROOSTOOK, ss

SUPERIOR COURT
Docket No. CARSC-CV-18153

BERNARD NADEAU,

Plaintiff,

v.

**ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

TWIN RIVERS PAPER
COMPANY, LLC

Defendant.

Now before the Court is Defendant's motion for summary judgment seeking dismissal of Plaintiff's single-count complaint for retaliation under the Maine Whistleblowers' Protection Act ("MWPA"). *See* 26 M.R.S. §§ 831-840 (2018). The defendant, Twin Rivers Paper Company, argues that it is entitled to summary judgment because Plaintiff's MWPA claim is preempted by § 301(a) of the Labor Management Relations Act ("LMRA"). *See* 29 U.S.C. § 185(a).

**Summary Judgment Standard**

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). A material fact is one that can affect the outcome of the case. *Lougee Conservancy v. City Mortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774. A genuine issue of fact exists when there is sufficient evidence for a fact-finder to choose between competing versions of the fact. *Id.* When reviewing the record on a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party. *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 7, 129 A.3d 944. "Any doubt on this score will be resolved against the movant, and the

1

opposing party will be given the benefit of any inferences which might reasonably be drawn from the evidence." 3 Harvey, *Maine Civil Practice* § 56:5 at 240 (3d, 2011 ed.) A party seeking to avoid summary judgment must present a prima facie case for the claim or defense that is asserted for which it has the burden of proof. *Flaherty v. Muther*, 2011 ME 32, ¶ 31, 17 A.3d 640.

**Background**

The following material facts are not in genuine dispute:

Nadeau was employed by the defendant Twin Rivers Paper Company as a yard employee, mostly working as a forklift operator at the company's mill in Madawaska, Maine. During his employment, Nadeau was a member of the United Steelworkers Union ("Union") and worked under the terms of a collective bargaining agreement ("CBA") negotiated by the Union and Twin Rivers management. (Nadeau Dep. 54,) (Nadeau Dep. Ex. 3.) The CBA established work rules, company policies, and disciplinary procedures including a grievance process for all employees at the Madawaska Mill.

In February 2015, Nadeau was transferred to work in the basement distribution area of the mill. After his transfer, Nadeau complained to his supervisor on multiple occasions about dangerous conditions caused by toxic chemicals and dust in the work area. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 1.) In November 2015, Nadeau was disciplined under the CBA for unloading a tractor-trailer with a forklift without first locking the brakes and chocking the wheel, a violation of the company's safe truck operation policy. (Supp.'g S.M.F. ¶ 20-31.) The parties agree that Last Chance Agreements ("LCA") are recognized in the CBA and that these LCAs are negotiated among the company management, employee, and Union when the company has a strong basis for terminating an employee under the CBA but is willing to give the employee a

2

final chance to satisfactorily perform and maintain their job. (Supp.'g S.M.F. ¶ 32-33.) After the November 2015 disciplinary incident, Nadeau, company management, and the union entered into an LCA. (Supp.'g S.M.F. 36.) Nadeau signed the LCA agreement on December 1, 2015 and agreed to return to work under the agreement. (Supp.'g S.M.F. ¶ 35). The LCA provided that Nadeau would be required to adhere to all work rules outlined in the CBA. (Supp.'g S.M.F. 36.) (Nadeau Dep. 112-113.) If Nadeau failed to adhere to these work rules he would be subject to immediate termination, without the right to arbitration normally provided by the CBA. (Supp.'g S.M.F. 37.) (Nadeau Dep. 113.) Nadeau contends that his placement on an LCA was a retaliation for his complaints about unsafe working conditions and that the use of the LCA was an inconsistent application of discipline, compared to other coworkers who violated the same safety policy. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 16-17.)

While driving the forklift on August 27, 2016, Nadeau's forklift made some contact with a core saw at the Twin River's mill. (Nadeau Dep. 130-131.) Nadeau did not believe he caused any damage to the saw at the time and did not report the accident. (Nadeau Dep. 136, 146-148, 167.) After the accident, Twin River's management became aware of some damage to the core saw and investigated. (Supp.'g S.M.F. ¶ 49-60.) After this internal investigation, Twin Rivers concluded that Nadeau's accident damaged the saw. (Supp.'g S.M.F. ¶ 65.) Twin Rivers further concluded that by striking the core saw and failing to report the accident Nadeau had violated the CBA's disciplinary rules and was subject to termination under the LCA. *Id.* Nadeau then brought a grievance challenging his termination, which resulted in Twin Rivers offering to allow Nadeau to resign. (Supp.'g S.M.F. ¶ 68.) Nadeau and the union declined this offer and Twin Rivers terminated Nadeau's employment. (Supp.'g S.M.F. ¶ 70.) Nadeau then filed this suit alleging his discharge was a retaliatory termination in violation of the MWPA.

**Discussion**

Defendant argues that its motion for summary judgment should be granted because Nadeau's MWPA claim is preempted by § 301(a) of the LMRA. This federal statute provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The United States Supreme Court has interpreted this language to preclude state-law claims "whenever resolution of a state-law claim is substantially dependent upon analysis of the terms" of a collective bargaining agreement. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 10 (1st Cir. 1999); *see also Flores-Flores v. Horizon Lines of Puerto Rico, Inc.*, 875 F. Supp. 2d 90, 93-94 (D.P.R. 2012) ("[T]he court has expressly extended complete preemption to state law claims 'founded directly on rights created by collective-bargaining agreements' or 'substantially dependent on analysis of a collective-bargaining agreement.' . . . If one of those circumstances is satisfied, 'the preemptive force of 301 is so powerful as to displace entirely any state cause of action." (Quoting *Caterpilar Inc. v. Williams*, 482 U.S. 386, 394 (1987))). However, not all labor disputes brought in the form of a state-law claim are preempted under this standard.

A state-law claim is preempted by § 301 only when there is a real interpretive dispute of a CBA's terms. *Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir. 1997). The mere consultation of a CBA in the course of litigating a state-law claim is not sufficient to extinguish the state-law claim. *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994). Instead, courts confronted with state law claims must "locate the line between the need for mere consultation of a CBA,

4

which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims." *Lydon,* 175 F.3d at 10.

The policy purpose and interests that underlie the Supreme Court's determination that § 301 preempts state law claims arising from collective bargaining agreements are significant. The Supreme Court has interpreted § 301 as a congressional mandate to the federal courts to "fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers,* 471 U.S. at 209. Accordingly, the Court has concluded that in enacting § 301 Congress intended federal labor law to uniformly prevail over inconsistent local rules, meaning that the construction given to terms in collective-bargaining agreements must be determined by uniform federal law. *Id.* at 209-210.

The Supreme Court gave the following explanation for this uniformity principle in *Allis-Chalmers*:

> The subject matter of § 301(a) is peculiarly one that calls for uniform law . . . The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation . . . [and] might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

*Allis-Chalmers,* 471 U.S. at 210. These tandem interests in interpretative uniformity and predictability in the outcome of labor disputes require that questions relating to what parties to a labor agreement agreed upon and what legal consequences were intended to flow from a breach of that agreement be resolved according to uniform federal law. *Id.* at 211. As explained by the

5

Supreme Court, if the state courts were allowed to determine the meaning intended by the parties in adopting a particular contract term, the parties to labor agreements would become uncertain as to what they were binding themselves to when why they agreed to create certain labor terms. *Id.* Consequently, it would become more difficult for unions and employers to reach agreements and disputes as to the nature of the labor agreement would proliferate. *Id.* The preclusion of certain state law claims through § 301 is thus, a critical part of federal labor law that operates to reduce the occurrence of labor disputes and encourages predictability in the resolution of those disputes.

The issue presented in this case is whether or not the Court is required to actively interpret the CBA that Nadeau was working under when he was terminated. If interpretation beyond 'mere consultation' is required then the Court must conclude that Nadeau's state-law claim brought under the MWPA is preempted by § 301 of the LMRA. This Court concludes that it would be called to actively interpret the CBA to adjudicate this case and thus, concludes that Nadeau's MWPA claim is preempted.

§ 837 of the MWPA provides: "This subchapter shall not be construed to diminish or impair the rights of a person under any collective bargaining agreement." 26 M.R.S. § 837 (2018). The First Circuit has interpreted similar language found in the Massachusetts Workers' Compensation Act and found that, in context of a labor dispute, the statute obligated the court to actively interpret the CBA to determine if the CBA was inconsistent with the state law and therefore resulted in § 301 preemption. *Lydon,* 175 F.3d at 11; *Martin,* 105 F.3d at 44 (state-law claims under the MWCA are preempted "not because the collective bargaining agreement is inconsistent with the state claims asserted, but because it may be so and requires interpretation"); *Magerer v. John Sexton Co.,* 912 F.2d 525, 529-30 (1st Cir. 1990).[1]

---

[1] All of those cases involved plaintiff-employees who worked under a CBA and alleged that their employers retaliated against them for exercising their rights under the Massachusetts Workers'

The United States District Court for Maine has taken this same reasoning and concluded on three occasions that MWPA claims brought by employees subject to a collective bargaining agreement are preempted by § 301 of the LMRA because § 837 of the MWPA obligates the court to impermissibly interpret the agreement to determine whether it is inconsistent with state law. *See Webb v. Calais Reg'l Hosp.*, No. 1:18-cv-00117-LEW, 2019 U.S. Dist. LEXIS 113266, at *7 (D. Me. July 9, 2019); *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 136 (D. Me. 2010); *Bishop v. Bell Atl. Corp.*, 81 F. Supp. 2d 84, 88 (D. Me. 1999). In *Bishop*, the District Court further held that any MWPA claim made by an employee working under a CBA is almost by definition intertwined with an interpretation of the CBA and therefore preempted. *Bishop*, 81 F. Supp. 2d at 88-89 (preemption based on § 837 of the MWPA). As explained by Judge Brody's opinion in *Bishop*:

> The Maine Whistleblowers' Protection Act . . . provides that it "shall not be construed to diminish or impair the rights of a person under any collective bargaining agreement." 26 M.R.S.A § 837. This provision would require the Court to interpret the CBA between [the parties] in order to ensure that the Whistleblowers' Act does not "diminish or impair the rights" of those operating under the CBA. Since the Court is not permitted to engage in such interpretation, Plaintiff's claim under the Maine Whistleblowers' Protection Act is preempted. . . . In attempting to determine whether a statute is "inconsistent" with a collective bargaining agreement, or whether it "impair[s] or diminish[es]" the rights of those operating under such agreements, the Court would be engaged in the forbidden interpretation of a CBA.

*Id.*; *see also Webb*, 2019 U.S. Dist. LEXIS 113266, at *6-7; *Carmichael*, 679 F. Supp 2d at 136.

---

Compensation Act. That statute contains a section stating that "in the event that any right set forth in this section is inconsistent with an applicable collective bargaining agreement, such agreement will prevail." Mass. Gen. L. ch. 152, § 75B. In *Lydon, Martin*, and *Magerer*, the First Circuit decided that the employees' claims were preempted because that language in § 75B of the MWCA requires the court to interpret the particular collective bargaining agreement to determine whether the CBA is inconsistent with the state law. *Lydon*, 175 F.3d at 11; *Martin*, 105 F.3d at 44 (held that state-law claims under the MWCA are preempted "not because the collective bargaining agreement is inconsistent with the state claims asserted, but because it may be so and requires interpretation").

In *Carmichael*, the District Court explained further that even if the plaintiff-employee's claim could be stated and proven without reference to the CBA, the court would still first have to interpret the CBA to determine whether or not the MWPA would diminish or impair the rights of employees or management under the CBA. *Carmichael*, 679 F. Supp. at 136 ("Because it is this interpretation that the First Circuit has prohibited, Mr. Carmichael's MWPA claim is preempted.") This Court agrees with the First Circuit and the Maine District Court's reasoning on this issue and adopts the approach taken by the District Court in *Carmichael* and *Bishop*.[2]

Nadeau is an employee working under a collective bargaining agreement who has brought a claim under the MWPA. § 301 of the LMRA preempts state-law claims "whenever resolution of a plaintiff's claim is substantially dependent on analysis of" a CBA's terms. *Lueck*, 471 U.S. at 220. MWPA § 837 obliges the Court to actively interpret the terms of the collective bargaining agreement, an interpretation forbidden by federal law.[3] *Bishop*, 81 F. Supp. 2d at 88-89. Therefore, the Court must conclude that Nadeau's claim is preempted by § 301 of the Labor Management Relations Act and grant Defendant's motion for summary judgment.

---

[2] While only a decision of the Supreme Court of the United States on a federal constitutional question is precedentially controlling on the Maine state courts, the Law Court has clearly stated that: "in cases involving federal constitutional issues on which the Supreme Court has not spoken definitively or unambiguously," the relevant decisions rendered by the First Circuit "are particularly persuasive with us, and we will follow them so far as is reasonably possible." *In re Letellier*, 578 A.2d 722, 726 (Me. 1990); *see also State v. Gardner*, 509 A.2d 1160, 1163 (Me. 1986); *Littlefield v. State Dep't. of Human Servs.*, 480 A.2d 731, 737 (Me. 1984). Congress's power to preempt state law is derived from the Supremacy Clause of Art. VI of the Federal Constitution. *Gibbons v. Ogden*, 22 U.S. 1 (1824). And in *Allis-Chalmers Corp v. Lueck*, the Supreme Court determined that § 301 of the LMRA preempts state law remedies whenever resolution of a plaintiff's claim is substantially dependent on interpretation of a CBA's terms. 471 U.S. 202, 220 (1985). This preemption of state law was found necessary by the Supreme Court to retain consistency and uniformity in the interpretation of terms in collective bargaining agreements. *Livadas v. Bradshaw*, 512 U.S. 107, 122-23 (1994). For these reasons, we believe it is reasonable to give some deference to the First Circuit's interpretation and application of the Supreme Court's opinions regarding preemption of state law claims through the Labor Management Relations Act.

[3] Even if this were not the case, further adjudication of this matter would require the court to engage in a substantial analysis of the terms and structure of the CBA at issue in this case. Given the plaintiff's allegations, it would be necessary for the court to analyze: (1) the work rules in the CBA that plaintiff allegedly violated and were the purported basis for the defendant's decision to terminate; (2) the terms providing for the creation of "last chance agreements;" (3) the terms governing the company's grievance process and available remedies through that process.

8

Plaintiff argues that this case is not preempted under § 301 because when Nadeau was terminated he was not subject to the CBA, rather, his employment was completely governed by the "Last Chance Agreement" from the point the parties entered into it. Commonly understood, an LCA is an agreement between the employer, employee, and the union when the employer believes it has a strong basis for terminating the employee but wishes to allow the employee a final opportunity to satisfactorily perform. An LCA essentially allows the parties to modify the CBA regarding the disciplinary measures to be taken with respect to the particular employee. In this case, the authority and genesis of Nadeau's LCA arises from the CBA; the LCA is itself a product of the collective bargaining relationship between the management and the union. (Supp.'g S.M.F. ¶ 36-37.) In this framework, the LCA is part of the disciplinary process provided by the CBA and LCA's terms act as an addendum to the CBA regarding a particular employee who the employer believes has violated the terms of the CBA and may be dismissed.

The plaintiff's contention that the LCA acts as an overriding agreement ignores the actual substance and structure of the LCA. The text of the LCA consists of a single page that itself references and incorporates the terms of the CBA. The LCA provides that "it is expected that you adhere to all work rules outlined in the collective bargaining agreement, company policies, and safe work rules. Failure to do so will result in immediate discharge." (Nadeau Dep. Ex. 8) (copy of the Last Chance Agreement.) The LCA goes on to reference that if Nadeau was terminated for any reason while the LCA was in effect, he would have recourse under the CBA's grievance process. *Id.* Furthermore, the LCA does not state anywhere that it supplanted the entirety of the CBA's terms and rules governing Nadeau's employment. *Id.* Contrary to Plaintiff's assertion, Nadeau plainly did not cease being subject to the CBA by virtue of entering this LCA with his employer.

**Conclusion**

For the reasons discussed above, Defendant's motion for summary judgment is granted.

The entry is:

1. Defendant's motion for summary judgment is granted.

Dated: _November 13 '19_

_____

The Hon. Harold Stewart
Justice, Maine Superior Court