[No. B151867. Second Dist., Div. Six. Sept. 19, 2002.]

THE PEOPLE ex rel. THOMAS SNEDDON, JR., as District Attorney, etc., et al., Plaintiffs and Respondents, v.
TORCH ENERGY SERVICES, INC., et al., Defendants and Appellants.

## COUNSEL

Hollister & Brace, Steven Evans Kirby and Marcus S. Bird for Defendants and Appellants Torch Energy Services, Inc., Nuevo Energy Company and Black Hawk Oil Company.

Thomas Sneddon, Jr., District Attorney, and Jerry Lulejian, Deputy District Attorney, for Plaintiff and Respondent the People.

Stephen Shane Stark, County Counsel, Alan L. Seltzer, Chief Assistant County Counsel, and William M. Dillon, Deputy County Counsel, for Plaintiff and Respondent County of Santa Barbara.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, John A. Saurenman and Alice L. Busching, Deputy Attorneys General, for California Coastal Commission as Amicus Curiae on behalf of Plaintiff and Respondent County of Santa Barbara.

## OPINION

**COFFEE, Acting P. J.**—An oil company operates Platform Irene, an oil rig off the Santa Barbara coast. In 1997, a break in the pipeline carrying oil from Platform Irene to the company's onshore processing facility caused an oil

spill. The processing facility was built and began operating in 1987 after receiving permits from the County of Santa Barbara. The permits contained numerous conditions relating to the safe operation of the pipeline.

After the spill, the district attorney and the county filed this action against the oil company and other entities involved in the operation of Platform Irene, alleging that the spill occurred because oil company employees failed to comply with conditions in the permits. The superior court granted a permanent injunction ordering the company to comply with the condition of the permits and assessed civil fines and penalties. The court ruled that even if the permit conditions were preempted by federal law, the company was estopped from challenging their validity because it accepted the benefits of the permits. We affirm.

FACTS

The material facts are undisputed. In 1983, Union Oil Company (Unocal) applied to respondent County of Santa Barbara (County) for permits to construct a heating, separating and pumping plant; onshore pipelines; and an electrical substation within the County's coastal zone. These onshore facilities were needed to process oil from Platform Irene, an oil and gas drilling and production platform located on the outer continental shelf. During the following three years, the County approved a comprehensive plan amendment, a rezone, a major conditional use permit and, on May 13, 1986, a final development plan for the project.[1]

The County's approval of the project was based in part on Unocal's compliance with numerous conditions attached to the permits, including the preparation of and compliance with an Oil Spill Contingency Plan (OSCP) and a Safety Inspection, Maintenance and Quality Assurance Program (SIM-QAP). The permit conditions required the operator to design and integrate a supervisory control and data acquisition system for all components of the project to "provide timely and efficient detection, shutdown, notification and response to an emergency involving any of the project components," such that "[a]ny break, rupture, and/or damage to the pipeline shall result in the orderly shutdown of the pumping operations, and will activate the shut off valves in a manner which will minimize environmental damage."

No dispute over the permit conditions arose while Unocal owned the project. In 1994, appellants Torch Energy Services, Inc. (formerly known as

---

[1]Unocal also obtained permits from the United States Minerals Management Service, the California State Lands Commission, the California Office of Onshore Development and the California Coastal Commission. Environmental review was conducted jointly by the affected agencies.

Torch Operating Company), Nuevo Energy Company and Black Hawk Oil Company (collectively Torch) acquired the project from Unocal. At that time, Torch expressly agreed to comply with all conditions of the permits issued to Unocal. In 1996, Torch applied for and obtained additional permits from the County for the project. At that time, Torch reiterated its agreement to comply with all conditions of the permits and waived any objections to the conditions.

On September 28, 1997, a rupture occurred in the offshore portion of the pipeline within California state waters and the County's territorial limits. After conducting independent review, the County's expert concluded that Torch's personnel failed to follow the procedures of the OSCP and the SIMQAP.

The County filed this enforcement action to recover fines and civil penalties and to compel Torch to comply with the conditions of the permits. In its answer, Torch raised the affirmative defense of federal preemption. Specifically, Torch asserted that the County had no authority to impose the conditions in the first instance because the field of oil pipeline safety regulation is preempted by the Pipeline Safety Act (49 U.S.C. § 60101 et seq.) (PSA) and the Outer Continental Shelf Lands Act (43 U.S.C. § 1331 et seq.) (OCSLA). Therefore, Torch's representations that it would comply with the conditions are not enforceable. The County argued that (1) neither the PSA nor OCSLA completely preempted the field of pipeline safety, (2) the conditions are not safety regulations but environmental regulations, (3) the conditions are unassailable because they were not timely challenged by a petition for writ of mandate, and (4) Torch is estopped from arguing the invalidity of the conditions because it had accepted the benefits of the permits.[2] The parties filed cross-motions for summary judgment.

The trial court assumed the fact of preemption but granted the County's motion nonetheless on the ground that Torch was estopped from challenging the validity of the permit conditions. The parties raise these issues in this appeal.[3]

DISCUSSION

*Standard of Review*

█   We review a grant of summary judgment de novo. (*Travelers Casualty & Surety Co. v. Superior* Court (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].)

---

[2] We grant the parties' requests to take judicial notice of the legislative history of the PSA and OCSLA and federal regulations adopted thereunder.

[3] Torch has not argued here, as it did in the trial court, that the conditions violated the commerce clause of the United States Constitution. Torch also has not appealed from the portion of the judgment imposing penalties and fines.

*Preemption*

■ The supremacy clause of article VI of the United States Constitution grants Congress the power to preempt state law.[4] Any state law that conflicts with a federal statute is "without effect." (*Maryland v. Louisiana* (1981) 451 U.S. 725, 746 [101 S.Ct. 2114, 2128-2129, 68 L.Ed.2d 576].) "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' [Citation.] . . . ' "[T]he purpose of Congress is the ultimate touchstone" ' of pre-emption analysis." (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407].) However, in areas where the federal government has a history of regulatory involvement, the presumption against preemption does not apply. (*United States v. Locke* (2000) 529 U.S. 89 [120 S.Ct. 1135, 146 L.Ed.2d 69] [Washington State restrictions on oil tanker operations preempted].)

There are three types of federal preemption. "First, Congress can define explicitly the extent to which its enactments pre-empt state law. . . . [W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one. [¶] Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' . . . [¶] Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, . . . or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*English v. General Electric Co.* (1990) 496 U.S. 72, 78-79 [110 S.Ct. 2270, 2275, 110 L.Ed.2d 65], citations & fn. omitted.) The first category is known as "express preemption" and the second and third categories are known as "implied preemption." (*Choate v. Champion Home Builders Co.* (10th Cir. 2000) 222 F.3d 788, 792.)

■ Torch argues that both the PSA and OCSLA contain express preemption clauses that completely preclude state regulation. The language in

---

[4]For preemption analysis, "state law" includes laws of local governments. (E.g., *AGG Enterprises v. Washington County* (9th Cir. 2002) 281 F.3d 1324, 1328.)

the PSA that Torch relies on states: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." (49 U.S.C. § 60104(c).) Torch also relies on an administrative regulation which states: "The HLPSA leaves to exclusive Federal regulation and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce." (Appen. A to 49 C.F.R. § 195 (1998).)[5]

Torch cites numerous federal cases, holding that the PSA expressly preempts the field of interstate pipeline safety regulation, as well as a case from a different division of this court, *Southern Cal. Gas Co. v. Occupational Safety & Health Appeals Bd.* (1997) 58 Cal.App.4th 200 [67 Cal.Rptr.2d 892], holding that the predecessor to the PSA, the NGPSA, expressly preempts state regulation relating to the safety of interstate pipelines. We quote the state case because its language is clear and concise: "We find that it was the 'clear and manifest purpose of Congress' to occupy the field of interstate natural gas pipeline safety, in the broadest sense possible. . . . The state was precluded from regulating the design of equipment or its use in the operation or maintenance of interstate natural gas pipelines. Since Congress has fully occupied the field of natural gas pipeline safety, there is no room for state supplementary regulation, even if there is no conflict with any given provision. . . . [¶] The [state] Division was without jurisdiction to enforce either conflicting, supplementary, or duplicative regulations, and the citation issued by it is a nullity." (*Id.* at pp. 209-210, citations & fn. omitted.)

The *Southern California Gas Co.* case is directly on point and we agree with its conclusion. The language of the PSA clearly expresses the intent of Congress to fully occupy the field of oil and gas operations and interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted.

We have considered the arguments of the County and of the amicus curiae California Coastal Commission, represented by the California Attorney General, that the permit conditions are not preempted and find them less than compelling. The County's briefs do not even mention the *Southern California Gas Co.* case. The Attorney General makes a brief attempt to distinguish the case on the ground that administrative conditions, not legislative enactments, are involved here. The Attorney General cites no authority to support this argument, and we have found no case that makes this distinction.

---

[5]The PSA, enacted in 1994, combined and recodified without substantive change the two existing pipeline safety statutes, the Hazardous Liquids Pipeline Safety Act of 1979 (former 49 U.S.C. §§ 2001-2014) (HLPSA) and the Natural Gas Pipeline Safety Act of 1968 (former 49 U.S.C. § 1671 et seq.) (NGPSA).

The County's argument that the conditions are not preempted because they are "environmental," not "safety," regulations was rejected in *Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 106 [112 S.Ct. 2374, 2387, 120 L.Ed.2d 73] [" '[W]hen considering the purpose of a challenged statute, this Court is not bound by "[t]he name, description or characterization given it by the legislature or the courts of the State," but will determine for itself the practical impact of the law' "].)

Our conclusion that the PSA expressly preempts the field of pipeline safety regulation makes it unnecessary for us to consider the preemptive effect of the OCSLA and the numerous other arguments made by the parties concerning preemption.

*Estoppel*

Torch argues that a conclusion that federal law preempts the field should end our inquiry. The trial court, however, used federal preemption as a starting point for its analysis; therefore, we shall address the question of whether the supremacy clause absolves Torch from complying with the conditions of the permits.

■ Torch correctly argues that preemption implicates subject matter jurisdiction and that "subject matter jurisdiction can never be created by consent, waiver or estoppel." (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 47 [269 Cal.Rptr. 228]; see also *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 956 [91 Cal.Rptr.2d 66] ["preemption implicates subject matter jurisdiction and cannot be waived"].)

■ Preemption cannot be defeated by state law defenses. (*Sola Electric Co. v. Jefferson Co.* (1942) 317 U.S. 173, 176-177 [63 S.Ct. 172, 173-174, 87 L.Ed. 165].) Therefore, the cases relied on by the County and the trial court, *County of Imperial v. McDougal* (1977) 19 Cal.3d 505 [138 Cal.Rptr. 472, 564 P.2d 14], and its progeny, are insufficient to support an estoppel against Torch. The cases cited by the County regarding constitutional rights of private parties also do not resolve the issue.

■ There is, however, an applicable federal defense supporting the trial court's injunction. This doctrine is usually called "judicial estoppel" but also has been referred to as the "doctrine of preclusion of inconsistent positions" and "quasi-estoppel." (See, e.g., *Rissetto v. Plumbers and Steamfitters Local 343* (9th Cir. 1996) 94 F.3d 597, 600-601; *Bell Lavalin Inc. v. Simcoe and Erie General Ins.* (9th Cir. 1995) 61 F.3d 742, 749, fn. 7.) California state

courts apply the doctrine as well. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181-183 [70 Cal.Rptr.2d 96].) We requested the parties to provide supplemental briefing on the issue.

Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. (*Yanez v. U.S.* (1993) 989 F.2d 323, 326; *Russell v. Rolfs* (9th Cir. 1990) 893 F.2d 1033, 1037.) The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. (*Patriot Cinemas, Inc. v. General Cinema Corp.* (1st Cir. 1987) 834 F.2d 208, 212, 214.) Application of the doctrine is discretionary. (*U.S. v. Ruiz* (9th Cir. 1996) 73 F.3d 949, 953.) Courts apply the doctrine to prevent internal inconsistency, preclude litigants from playing "fast and loose" with the courts, and prohibit "parties from deliberately changing positions according to exigencies of the moment." (*U.S. v. McCaskey* (5th Cir. 1993) 9 F.3d 368, 378; see also *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.* (1994) 259 Ill.App.3d 836, 850 [200 Ill.Dec. 146, 635 N.E.2d 485, 494-495] ["At its heart, [it] prevents chameleonic litigants from 'shifting positions to suit the exigencies of the moment' . . . , engaging in 'cynical gamesmanship' . . . or 'hoodwinking' a court"].)

The party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that the position was adopted by the first tribunal in some manner such as by rendering a favorable judgment. (*Interstate Fire v. Underwriters at Lloyd's, London* (9th Cir. 1998) 139 F.3d 1234, 1239.) The prior inconsistent assertion need not be made to a court of law. Statements to administrative agencies may also give rise to judicial estoppel. (See *Mitchell v. Washingtonville Cent. School Dist.* (2d Cir. 1999) 190 F.3d 1, 6; see also *Chaveriat v. Williams Pipe Line Co.* (7th Cir. 1993) 11 F.3d 1420, 1427 ["Though called *judicial* estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding"]; *Davis v. Wakelee* (1895) 156 U.S. 680, 689 [15 S.Ct. 555, 558, 39 L.Ed. 578] ["It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him"].) The doctrine may be used to estop a party from asserting federal preemption. (*Lydon v. Boston Sand & Gravel Co.* (1st Cir. 1999) 175 F.3d 6.) In *Lydon,* an employer removed an employee's workers' compensation state court action to federal court, asserting that the action was precluded by a

collective bargaining agreement and was preempted by the Labor Management Relations Act, section 301 (29 U.S.C. § 185) (LMRA). The federal district court found the employee's claims were preempted and dismissed the case. The appellate court reversed. The court acknowledged that the employee's claims would likely be preempted by the LMRA under normal circumstances. However, in a prior arbitration proceeding, the employer and employee stipulated that the collective bargaining agreement did not apply and the employer successfully argued that state law provided the employee's exclusive remedy. In reliance on these representations, the employee filed suit in state court. The court rejected the employer's preemption defense because the employer's "inconsistency is both patently unfair to [the employee] and destructive to the integrity of the judicial system." (*Lydon,* at p. 13.)[6]

We exercise our discretion and apply judicial estoppel to prevent Torch from escaping a long-established commitment to comply with the County's regulations. To do otherwise would reward inequitable conduct and "cynical gamesmanship."

The judgment of the trial court is affirmed. Costs are awarded to respondents.

Yegan, J., and Perren, J., concurred.

On October 4, 2002, the opinion was modified to read as printed above.

---

[6]Torch's reliance on *Mississippi Power v. Moore* (1988) 487 U.S. 354, 376, footnote 14 [108 S.Ct. 2428, 2441, 101 L.Ed.2d 322], for the proposition that a party cannot be estopped from asserting federal preemption by the party's earlier representations is misplaced. The portion of text quoted by Torch was taken from a footnote in a case that bears no factual resemblance to the instant case and does not discuss the doctrine of judicial estoppel.