Filed 8/28/13  Zurich American Ins. v. AIU Ins. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>AIU INSURANCE COMPANY,<br><br>    Defendant and Respondent,<br><br>LEXINGTON INSURANCE COMPANY,<br><br>    Defendant and Appellant. | A133700<br><br>(Alameda County<br>Super. Ct. Nos. RG-07-360089,<br>RG-08-416902 ) |

## I.  INTRODUCTION

This appeal arises out of a protracted dispute regarding liability and insurance coverage for property damage to an office building caused by a construction defect.  In this round of litigation, Zurich American Insurance Company (Zurich) sought equitable indemnity and subrogation from AIU Insurance Company (AIU) for a $900,000 payment that Zurich made to settle claims against the parties' mutual insured, Frederick Meiswinkel Co., Inc. (FMI).  Zurich also sought equitable contribution from Lexington Insurance Company (Lexington) for a portion of the defense costs it paid in the underlying property damage case against FMI.

After a non-jury trial, the superior court found that AIU was not liable for the settlement payment that Zurich paid on behalf of FMI because the claims against FMI in the underlying action were excluded from coverage under an AIU policy exclusion for

1

damages caused by FMI's work. The court also found, however, that Lexington failed to pay its share of the defense costs of the underlying lawsuit against FMI and that it owed that amount to Zurich. Both Zurich and Lexington filed appeals. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Hopyard Project*

In 1996, C.M. Centerprop commenced plans to develop a commercial office building at 5050 Hopyard Road in Pleasanton. In February 1997, Centerprop executed a prime contract with the general contractor, L.E. Wentz Co. The building plans called for an "exterior insulation finish system" (an EIFS system), which would be a "design build" element of the project. In July 1997, Wentz entered into a subcontract with FMI, pursuant to which FMI agreed to design, furnish and install the EIFS system on the Hopyard building.

The EIFS system that FMI designed called for a "bullnose" component, a piece of shaped foam that resembles a bull's nose. FMI obtained the bullnoses from Bay Foam, Inc. To construct the bullnoses, Bay Foam used its machines to cut foam blocks into the specifically-designed element, applied modified cement to them, embedded fiberglass mesh, reapplied additional acrylic layers, and then delivered them to the jobsite. There was no written agreement between FMI and Bay Foam regarding the fabrication and provision of these bullnoses.

Building construction was completed in 1998. That winter, the EIFS system started to crack and leak. In 1999, both FMI and Bay Foam made repair attempts but the EIFS system continued to fail.

### B.     *The Chawin Action*

In 2004, Chawin Property, Inc., Centerprop's successor in interest, filed an action for damages for breach of contract, breach of warranty and negligence against Wentz, FMI and others. At some point, Chawin named Bay Foam as a defendant and alleged a cause of action against it for negligence. Wentz also filed a cross-complaint for indemnity against FMI.

Chawin settled some of its claims relating to damage caused by leaking decks on the Hopyard building. However, the "EIFS-related disputes" were submitted to binding arbitration. Although Bay Foam had not entered into a contract with any other party and had no contractual obligation to arbitrate, it agreed to participate. However, Bay Foam settled with Chawin and was dismissed from the action before the arbitration hearing commenced.

In late January 2006, a 10-day arbitration hearing was conducted before Arbitrator Ernest C. Brown. The parties stipulated that the EIFS system had caused significant leaks starting in the winter of 1998. The key issues at the hearing included identifying causes of the leaks, selecting the proper repair method and assessing legal responsibility for the damage. On March 28, 2006, the arbitrator set forth his findings in an interim award, which was subsequently incorporated into a final award that was entered on July 14, 2006. The following month, the arbitrator filed a "Clarification" of the disposition and award. In this opinion, we will refer to these three related orders as the final award.

On the issue of causation, the arbitrator's findings included the following: (1) FMI had "design build" responsibility for the EIFS system. (2) The "principal reason" for the cracking of the EIFS system was "the lack of proper placement of the reinforcing mesh within the cross-sections of the laminate" on the foam shapes supplied by Bay Foam. (3) Bay Foam was primarily responsible for the failure of the EIFS system because it improperly applied the mesh to the foam shapes that it supplied to FMI. (4) The "secondary reasons" for the system failure were design defects attributable to FMI. (5) FMI's field installation technique was also a contributing factor to the harm.

The appropriate repair method was the subject of extensive disagreement among the parties. Ultimately, the arbitrator concluded that the existing EIFS System should be replaced with a new Outsulation System. The arbitrator also found that Chawin's damages associated with that repair totaled $3,143,500.

In assessing the legal liability of the parties, the arbitrator found that Wentz was liable to Chawin, and that FMI was liable to both Wentz and Chawin. FMI was liable to Wentz for breach of the subcontract, breach of warranty and negligence because it failed

3

to adhere to product manufacturer specifications as well as good practices in the EIFS industry, and because, "[a]s the EIFS Design-Build subcontractor, FMI [was] legally responsible for the erroneous mesh embedment in the materials supplied by its supplier, Bay Foam." FMI was also liable to Chawin for negligence and, therefore, Chawin could recover damages directly from FMI.

The final award holds FMI and Wentz jointly and severally liable for Chawin's damages, although it also gives them an $825,000 credit for the Chawin-Bay Foam settlement. The final award also holds FMI and Wentz jointly and severally liable for Chawin's attorney fees and costs, although it apportions three quarters of the liability for those amounts to FMI.

In October 2006, Chawin, Wentz and FMI settled all of their claims arising out of the Hopyard project pursuant to an agreement which was coordinated with a related partial settlement of an action that FMI had filed against its insurance companies.

## C.    *FMI's Insurance Coverage and Bad Faith Action*

In May 2006, before the final award was entered by the Chawin arbitrator, FMI filed an action against four insurances companies that had issued policies to FMI during the period when the damage to the Hopyard building could potentially have occurred: Zurich, Lexington, Transcontinental Insurance Company, which was later acquired by CNA, and AIU.

During the relevant time period, FMI had obtained successive policies affording primary commercial insurance coverage from Transcontinental Insurance Company/CNA (1998-2000), Zurich (2001) and Lexington (2002-2003). In 1998 and 1999, FMI was also covered under excess insurance policies issued by AIU, a company affiliated with Lexington via their parent, American Insurance Group (AIG).

FMI's complaint against these insurers included causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. It alleged, among other things, that the defendants failed to properly investigate FMI's claim, failed to provide FMI with an adequate defense in the Chawin action, and relied on improper exclusions to deny coverage and indemnity for FMI's insurance claim.

4

In October 2006, FMI settled its claims against Zurich and Transcontinental/CNA. Wentz and its insurance company, St. Paul Fire, were also parties to the October 2006 settlement agreement. Pursuant to this agreement, each party agreed to make a payment to Chawin in order to settle the claims in the Chawin action: FMI agreed to pay $25,000; Zurich agreed to pay $900,000; Transcontinental agreed to pay $1,775,000, and Wentz/St. Paul agreed to pay $225,000. The October 2006 settlement agreement also called for mutual releases, but those releases expressly did not apply to Zurich or Transcontinental's right to pursue claims against FMI's other insurers for defense, indemnity or any other payment of a claim arising out of the Hopyard project.

In January 2007, FMI settled its claims against Lexington and AIU. In exchange for a total payment of $127,500, FMI released all claims against Lexington and AIU arising out of or relating to the Hopyard project and the insurance coverage disputes associated with that project.

**D.**   ***The Present Action***

In June 2007, Zurich initiated this action against AIU and Lexington.[1] Via its operative second amended complaint, Zurich alleged causes of action for equitable contribution, indemnity and subrogation, seeking to recover (1) reimbursement from Lexington for a portion of the defense costs it paid in the Chawin action, and (2) indemnity from either Lexington or AIU for the $900,000 payment it made to settle the Chawin action.

To support its claims against Lexington for reimbursement of the FMI defense costs, Zurich alleged that FMI tendered defense of the Chawin action to its three primary insurers (CNA, Zurich and Lexington) on June 9, 2004, that Zurich and CNA agreed to defend pursuant to reserved rights, but that Lexington did not accept FMI's tender until January 2006. Because of that late acceptance, Zurich alleged, Lexington failed to pay its

---

[1] Zurich first sued AIU and Lexington in Los Angeles Superior Court, but later that year the action was transferred to Alameda County Superior Court. By stipulation, that action was consolidated with a similar suit brought by CNA. Shortly thereafter, CNA settled with the other insurers and dismissed its action.

share of the Chawin defense costs. Zurich also alleged that Lexington had failed to pay its share of the fees and costs taxed against FMI in the Chawin arbitration (the Chawin fee award). According to Zurich, the Chawin fee award was part of the defense obligation of the three primary insurers pursuant to a provision for "supplementary payments" coverage that was included in each of the primary policies.[2]

Zurich also claimed that either Lexington or AIU was required to indemnify it for the $900,000 Chawin settlement payment. Zurich's primary theory was that the Chawin arbitrator made a finding that the Hopyard property damage was a continuous/progressive loss that occurred in 1998, that this finding was binding in this insurance coverage action, and that it triggered coverage under the 1998 AIU excess policy. Alternatively, Zurich argued that if the arbitrator's finding was not binding, then two discreet losses occurred, one in 1998 and another in 2002, thus triggering primary coverage under the 2002 Lexington policy.

Lexington maintained that it was not liable for any part of the Chawin settlement payment because FMI's claim pertained to a loss that occurred in 1998 when it did not have insurance with Lexington. Lexington also claimed that it did not owe Zurich equitable contribution for the FMI defense costs because it paid its share of the costs that were incurred during the discreet time period when it had a duty to defend FMI in the Chawin action. In taking this position, Lexington argued, among other things, that FMI did not tender defense of the Chawin action to Lexington until December 2005.

AIU took the position that it was not liable for any part of the Chawin settlement. AIU's primary theory was that the FMI claim was subject to a policy exclusion for damages arising out of "your work," which stated: "This insurance does not apply to: . . . . [¶] "G. **Property Damage To Your Work** arising out of it or any part of it and included in the '**Products-Completed Operations Hazard**.' [¶] This exclusion does not

---

[2] The "supplementary payments" provision in Lexington's policy stated: "We will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend . . . [a]ll costs taxed against the insured in the 'suit.' "

apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." [3]

In relying on this exclusion, AIU disputed Zurich's contention that the "your work" exclusion did not apply to the FMI claim because Chawin's damages arose from work performed by Bay Foam, who was a subcontractor within the meaning of the exception to the "your work" exclusion.

In June 2010, the Honorable John True decided cross motions for summary judgment or summary adjudication. The court granted summary adjudication to Lexington on the claims seeking indemnity and subrogation for the $900,000 payment that Zurich made to settle the Chawin action. The court found that undisputed evidence established the Hopyard property damage occurred in 1998 and grew continuously worse in subsequent years. Therefore, the FMI claim was not covered by the 2002 Lexington policy. The court also granted AIU summary adjudication with respect to Zurich's claim for equitable contribution, finding that a primary insurer cannot obtain that remedy from an excess insurer, as a matter of law.

However, the court denied both sides summary adjudication of Zurich's claims against Lexington for contribution to defense expenses and subrogation of defense expenses. The court found that the evidence established that Lexington contributed $86,078.91 to the defense of FMI in the Chawin action, but there was a triable issue of fact as to whether that contribution represented Lexington's share of the Chawin defense costs.

The court also denied summary adjudication of Zurich's claims against AIU for equitable indemnity and subrogation of the Chawin settlement payment because it found there were triable issues of material fact regarding whether the FMI claim was covered by the AIU policy. In this regard, the court found the parties both produced substantial

---

[3] The AIU policy defined "your work" as "1. Work or operations performed by you or on your behalf, and [¶] 2. Material, parts or equipment furnished in connection with such work or operations."

evidence to support their conflicting views regarding the applicability of the subcontractor exception to the "your work" exclusion in the AIU policy.

**E.      *Trial and Judgments***

In July 2011, the court conducted a non-jury trial on Zurich's remaining equitable claims. Pursuant to Zurich's in limine motion, which AIU opposed, the court admitted the final award in the Chawin arbitration into evidence and ruled that the award was binding on these parties. That ruling led to a disagreement between Zurich and AIU as to whether the arbitrator made a material finding that Bay Foam was not a subcontractor on the Hopyard project.

Pursuant to the parties' stipulation, the trial court bifurcated and decided first the issue whether Bay Foam was a subcontractor within the meaning of the exception to the "your work" exclusion in the AIU policy. The court also accepted the parties' stipulation regarding the evidence it should consider to resolve that issue. Based on that evidence, the trial court concluded that the Chawin arbitrator made a substantive finding that Bay Foam was not a subcontractor on the Hopyard project. The court then adopted that finding, concluded that the "your work" exclusion in AIU's policy applied and, therefore, dismissed AIU from the case. The trial then continued with respect to Zurich's claims against Lexington.

On September 8, 2010, the trial court issued a statement of decision in favor of Zurich on its claim for equitable contribution from Lexington in the total amount of $205,288.19. To support this award, the court found, among other things, that Lexington's obligation to defend FMI arose in June 2004, at the same time Zurich started defending FMI, and continued until October 2006, when the Chawin action settled. The court also found that the prevailing party fees awarded against FMI in the Chawin arbitration constituted part of the defense obligation under the terms of the supplementary payments provision in the Lexington policy and under California law.

In a separate statement of decision issued the same day, the court made findings against Zurich on its claims against AIU. The court found that Zurich could not recover the Chawin settlement payment from AIU because the parties were bound by the material

findings in the final award, including the finding that "Bay Foam was a supplier, and not a subcontractor, of mutual insured FMI . . . ." The court found that "[s]ince [Zurich] is prevented, as a matter of law, from demonstrating that Bay Foam is anything other than a supplier, the 'your work' exclusion contained in the 1998 AIU Policy excludes coverage for the Chawin award" and Zurich's subrogation and indemnity claims necessarily fail.

On September 13, 2011, amended judgments were entered in favor of Zurich on the issue of defense fees and costs and in favor of AIU on the issue of coverage. On October 3, 2011, Lexington filed a motion for a new trial, which was denied a month later. On November 9, 2011, Zurich filed a notice of appeal from both the trial court's order denying its earlier motion for summary judgment and, also, from the amended judgment against it entered on September 13, 2011. Lexington also filed a notice of appeal from that part of the trial court's judgment regarding costs and damages from it to Zurich.

### III. ZURICH'S APPEAL

A. *Issues On Appeal*

Zurich contends the judgment in favor of AIU must be reversed because it rests on the erroneous finding that FMI's insurance claim was excluded from coverage by the "your work" exclusion in the AIU policy. Zurich maintains that the record conclusively establishes that the FMI claim fell within an exception to that exclusion because the damages were caused primarily by Bay Foam which was a subcontractor on the Hopyard project.

To support this claim, Zurich attempts to establish that the trial court made three distinct errors which led it to conclude that Bay Foam was not a subcontractor but only an FMI supplier: First, it gave binding effect to the final award in the Chawin arbitration. Second, it erroneously found that the Chawin arbitrator made a material finding that Bay Foam was not a subcontractor. Finally, the trial court allegedly ignored controlling case

law which establishes that Bay Foam was a subcontractor as a matter of law. We will separately address these three distinct claims of error.[4]

**B.** *The Binding Effect of the Final Award*

Zurich's first contention is that the trial court committed reversible error by ruling that the final award in the Chawin arbitration was binding in this case. To support this claim of error, Zurich relies on *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 834, 836-837 (*Vandenberg*).

*Vandenberg* was an action to establish insurance coverage for a $4 million judgment for property damage caused by the breach of a commercial lease. (*Vandenberg, supra*, 21 Cal.4th at pp. 826-827.) The judgment had been entered against the plaintiff pursuant to a prior arbitration award. In the subsequent coverage action, the insurer defendants moved for summary judgment, arguing that principles of collateral estoppel precluded the plaintiff from relitigating an issue resolved in the arbitration case which established that the loss was excluded from coverage under a "pollution exclusion" in the defendants' policies. (*Id*. at p. 827.) The trial court granted summary judgment, but the Court of Appeal reversed, finding that collateral estoppel did not apply under those circumstances.

The *Vandenberg* court affirmed, holding that the trial court erred by giving nonmutual collateral estoppel effect to a private arbitration award absent an agreement to that effect among the parties to the prior arbitration. (*Vandenberg, supra*, 21 Cal.4th at p. 824.) In reaching this decision, the court focused on the special considerations attendant to any nonmutual use of the collateral estoppel doctrine. The court cautioned that such cases require careful scrutiny to ensure that application of the doctrine is fair and appropriate. (*Id*. at p. 830.) It also observed that traditional justifications for insulating

---

[4] In a separate argument, Zurich contends it was entitled to summary judgment on its equitable subrogation claim against AIU. However, in making this argument Zurich assumes we will accept its theory that Bay Foam was a subcontractor and it incorporates that assumption into its analysis. Because we affirm the trial court's finding regarding Bay Foam's status, we do not reach this separate claim of error. Nor do we address AIU's objections to it or alternative theories for affirming the judgment.

an arbitrator's decision from judicial scrutiny do not address the "very different considerations [that] affect the issue whether private arbitration awards should have nonmutual collateral estoppel effect." (*Id.* at p. 831.)

Ultimately, the *Vandenberg* court found that the "policies underlying the doctrine of collateral estoppel must yield to the contractual basis of private arbitration, i.e., the principle that the scope and effect of the arbitration are for the parties themselves to decide." (*Vandenberg, supra,* 21 Cal.4th at pp. 833-834.) Therefore, the court adopted what it acknowledged to be a minority view that "a private arbitration award, even if judicially confirmed, can have no collateral estoppel effect in favor of third persons unless the arbitral parties agreed, in the particular case, that such a consequence should apply." (*Id*. at p. 834.)

On appeal, Zurich contends that this "situation" is no different than *Vandenberg* because neither Zurich nor AIU were parties in the Chawin action. Therefore, Zurich contends that *Vandenberg* "dictates that Zurich American should not have been barred or estopped from litigating in the coverage action whether a 'subcontractor' exception to the 'your work' exclusion applies to restore coverage." We reject this argument for at least two reasons.

First, the doctrine of judicial estoppel precludes Zurich from gaining an advantage on appeal by taking a contrary position from what it argued below. (*People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, 189-190.) As reflected in our background summary, the arbitrator's final award was admitted into evidence and given binding effect pursuant to Zurich's motion and over AIU's objection. Indeed, Zurich expressly argued to the trial court that this case was not governed by the *Vandenberg* rule. Because the lower court accepted this argument, AIU was precluded from contesting the arbitrator's findings regarding FMI's liability to Chawin. In light of these circumstances, application of the doctrine of judicial estoppel is appropriate in order to "prevent internal inconsistency, preclude litigants from playing 'fast and loose' with the courts, and prohibit 'parties from deliberately changing positions according to exigencies of the moment.' [Citations.]" (*Id*. at p. 189.)

11

Second, we disagree with Zurich's new theory that *Vandenberg* squarely applies in this case. In *Vandenberg*, the attempt of third party strangers to the arbitration to invoke principles of nonmutual collateral estoppel raised unique concerns. Here, by contrast, Zurich, the party who requested that the arbitration award be given binding effect, was not a stranger to the arbitration; in seeking indemnity for its Chawin settlement payment from AIU, Zurich stood in the shoes of FMI, an arbitrating party. Thus, the question presented to the trial court in this case was not whether a stranger to an arbitration could benefit from the arbitration award, but rather whether and to what extent an insurer was bound by a final arbitration award entered against its insured. As Zurich argued below, that distinct question was addressed in *Executive Risk Indemnity, Inc. v. Jones* (2009) 171 Cal.App.4th 319 (*Executive Risk*).

*Executive Risk* was an insurance coverage dispute over claims arising from investment advice and financial planning services that a company called STARS provided to an individual named Jones. (*Executive Risk, supra*, 171 Cal.App.4th at pp. 321-322.) Jones obtained a $22 million arbitration award against STARS. STARS, insolvent and denied any defense by its insurer Executive Risk Indemnity, Inc. (ERII), assigned its rights under the ERII policy to Jones. In the ensuing coverage action by Jones, the trial court ruled that ERII was not bound by the arbitration award and judgment because it was not a party or in privity with a party to the arbitration. (*Ibid*.) Therefore, the court conducted a new trial on the issues of STARS's liability to Jones which resulted in a finding that STARS was not liable to Jones at all. (*Id*. at p. 323.) The *Executive Risk* court reversed, holding that "ERII was bound by the results of the arbitration proceeding between its insured, STARS, and the injured party, Jones," and that ERII could not contest the validity of STARS's liability to Jones or the amount of damages as established by the arbitration judgment. (*Ibid*.)

The *Executive Risk* court reasoned that the collateral estoppel principles that the trial court had applied were not the correct analysis for determining whether an insurance company has a contractual obligation to indemnify a loss under its policy. (*Executive Risk, supra*, 171 Cal.App.4th at pp. 328-329.) As the court explained, "courts have

12

generally examined the right of insurers to reopen and relitigate the liability of their insureds for covered losses and resulting damages, which have already been established by third party judgments, without resorting to principles of privity or collateral estoppel. Instead, the cases employ a distinct preclusion doctrine, which is more akin to the well-settled principles of contractual indemnity." (*Id*. at p. 329.) The court then reviewed the pertinent case law from which it formulated the following rule for applying the preclusion doctrine: "[W]hen an insurer (1) is duly notified of the underlying claim against its insured; and (2) is given a full opportunity to protect its interests, the resulting judgment—if obtained without fraud or collusion—is binding against the insurer in any later coverage litigation on the claim involving its insured. This rule applies regardless of whether the insurer has a contractual duty to defend, or whether or not its refusal to participate in the underlying proceedings is legally justified." (*Id*. at p. 333.)

As *Executive Risk* demonstrates, the fact that a judgment is based on an arbitration award, as opposed to a trial, does not preclude application of the preclusion doctrine. (*Executive Risk, supra*, 171 Cal.App.4th at p. 333.) Furthermore, the parties in this case both expressly agree that an unconfirmed arbitration award is considered final for purposes of determining its preclusive effect. (See *Thibodeau v. Crum* (1992) 4 Cal.App.4th 749, 755.) Therefore, we reject Zurich's contention that the trial court erred by giving the Chawin arbitration award preclusive effect in this case where there has never been a dispute that both Zurich and AIU had notice of the Chawin action and the opportunity to participate in FMI's defense.

## C. *The Arbitrator's Finding Regarding Bay Foam*

Changing its tact, Zurich concedes that the preclusion doctrine approved in *Executive Risk* does apply here.[5] In this regard, Zurich expressly acknowledges that "California courts have repeatedly affirmed that an insurer with notice of an action against its insured . . ., absent fraud or collusion, is bound by the underlying liability and

---

[5] In its appellate briefs, Zurich prefers to call this doctrine the "bound judgment rule." It is not clear to us why Zurich uses this term, which is not supported by any cited authority.

damages determinations, as well as, all material findings of fact essential to the judgment of liability and damages." (Citing, e.g., *Executive Risk, supra*, 171 Cal.App.4th at p. 329; *Kruger v. California Highway Indemnity Exchange* (1927) 201 Cal. 672, 678; *Schaefer/Karpf Productions v. CNA Ins. Co.* (1998) 64 Cal.App.4th 1306, 1313 (*Schaefer/Karpf*).

However, Zurich contends that a proper application of the preclusion doctrine establishes that Zurich was not precluded from litigating the specific question whether Bay Foam was a subcontractor because the Chawin arbitrator did not make a material finding that Bay Foam was not a subcontractor on the Hopyard project. Zurich's convoluted analysis of this issue rests on several false propositions.

First, Zurich contends that the arbitration award itself proves that "Bay Foam's specific relationship to FMI was not even at issue" in the arbitration because the arbitrator actually "documented" the fact that Bay Foam settled out of the case before the arbitration started. But the fact that Bay Foam settled prior to the hearing does not mean that its role in the construction project was not at issue.[6] Indeed, the arbitration award also clearly "documents" that the arbitrator was charged with determining the causes of the construction defect and the respective liabilities of the parties for the resulting damage. Bay Foam's specific relationship to FMI obviously played a role in the outcome of those overlapping inquiries.

Thus, for example, in support of the conclusion that FMI was liable for negligence, the arbitrator made the following express finding: "As the EIFS Design-Build subcontractor, FMI is legally responsible for the erroneous mesh embedment in the material supplied by its supplier, Bay Foam." This substantive finding regarding FMI's liability was supported by additional factual findings that the EIFS system was a "design build" element of the project, that it was "taken on by Wentz and then subsequently

---

[6] We note that the appellate record contains a copy of an arbitration brief that Bay Foam filed before it was dismissed from the Chawin action in which it claimed that it was FMI's supplier, that it was not a subcontractor on the Hopyard project, and that it did not have a contractual obligation to any party in the case.

14

subcontracted in its entirety to FMI," and that "Bay Foam later was retained to supply the foam shapes that contained mesh and laminate that was pre-installed at their facility."

The final award also reflects that the arbitrator's decision to give the Chawin defendants credit for Bay Foam's prior settlement with Chawin was dictated by that fact that Bay Foam was FMI's supplier. In this regard, the final award states: "[T]he Arbitrator sees no reason that any such settlement amount paid by Bay Foam, Inc., as vendor to [FMI], should not be properly credited against the Final Award. The Arbitrator further believes that a Superior Court would ordinarily credit such payments by [FMI's] vendor towards this award. Again the Final Award is in favor of a building owner against a general contractor and its exterior water proofing system subcontractor for defects in the waterproofing system that was largely supplied by such vendor."

Zurich's second contention is that statements in the final award that refer to Bay Foam as an FMI supplier or vendor are not dispositive. Zurich reasons that, " '[i]n determining what issues were "actually litigated" in the underlying action the court in the subsequent action cannot rely exclusively on the findings in the underlying action but must "carefully scrutinize" the pleadings and proof.' " (Quoting *Schaefer/Karpf, supra,* 64 Cal.App.4th at p. 1314.) Indeed, Zurich contends that the trial court erred because it limited its inquiry to the findings in the arbitration award itself and failed to "carefully scrutinize" all of the pertinent evidence regarding the nature and scope of the arbitrator's findings in the underlying proceeding.

On this record, Zurich's claim that the trial court failed to carefully scrutinize the arbitration evidence is patently unreasonable. As reflected in our factual summary, when the issue whether Bay Foam was a subcontractor within the meaning of the exception to the "your work" exclusion was bifurcated pursuant to the parties' stipulation, the parties *also* stipulated as to the specific evidence that the court could and should consider in order to determine whether the arbitrator made a material finding on this issue and whether the court should adopt that finding in this case. The record establishes that the trial court considered all of the parties' evidence on that bifurcated issue before it found that "Bay Foam cannot properly be considered a subcontractor for the various reasons

15

referred to by the arbitrator" plus "the testimony of the witnesses we've heard this morning . . . ."

Finally, Zurich contends that the trial court erroneously excluded evidence that would have established that the arbitrator did not make a material finding that Bay Foam was not a subcontractor. That allegedly dispositive evidence was a declaration from Ernest Brown, the Chawin arbitrator. In his declaration, Brown stated that he was not retained to decide insurance coverage issues.

The trial court excluded the Brown declaration pursuant to Evidence Code section 703.5, which states that, except in cases not arguably relevant here, "no arbitrator . . . shall be competent to testify, in any subsequent civil proceeding, as to any statement, conduct, decision, or ruling, occurring at or in conjunction with the prior proceeding . . . ." On appeal, Zurich contends that this statute does not apply because Brown did not discuss a ruling or decision that he actually made but rather a ruling that he *did not* make. We are simply not persuaded by this circular reasoning. Furthermore, and in any event, the trial court expressly acknowledged that the arbitrator did not decide coverage issues, but nevertheless concluded that the arbitrator's findings regarding the respective liabilities of the parties necessarily encompassed a finding that Bay Foam was a supplier and not a subcontractor on the Hopyard project. As demonstrated above, the appellate record supports this trial court finding.

**D.**      *The Trial Court's Finding Regarding Bay Foam*

Zurich's third claim of trial court error is that the court failed to follow case law which establishes that Bay Foam was a subcontractor within the meaning of the exception to the "your work" policy exclusion, as a matter of law. According to this theory, if the arbitration award is binding, then (1) that award establishes that Bay Foam supplied custom-made materials for the Hopyard project, and (2) a supplier of custom-made materials constitutes a subcontractor as a matter of law. To support this theory, Zurich relies on *Collett v. Insurance Co. of the West* (1998) 64 Cal.App.4th 338 (*Collett*).

*Collett* was a coverage action against Insurance Company of the West (ICW) for refusing to indemnify its insured for a settlement of claims arising out the defective

16

construction of retaining walls at a residential development. (*Collett, supra*, 64 Cal.App.4th at p 339.) Plaintiff, a masonry contractor who built the walls, argued that his claim was covered because the damage resulted from his inspector's failure to discover the defects and that inspector was a subcontractor within the meaning of the exception to the "your work" exclusion in the ICW policy. The trial court disagreed and the *Collett* court affirmed that the "your work" exclusion applied. (*Ibid*.)

In reaching its decision, the *Collett* court rejected the plaintiff's contention that "the word 'subcontractor' in the exception refers to *anyone* who performs work on behalf of the insured." (*Collett, supra*, 64 Cal.App.4th at pp. 342-343.) The court reasoned that this proposed interpretation was "directly contrary to the plain language of the exception, which says ' "work . . . performed on your behalf *by a subcontractor*." ' [Citation.]" (*Ibid*.) The *Collett* court also rejected the plaintiff's theory that the term subcontractor should be "interpreted in its broadest sense so as to include the inspector hired by him." (*Id*. at p. 343.) To support that contention, plaintiff had relied on *National Union Fire Ins. v. Structural Syst. Tech*. (E.D. Mo. 1991) 756 F.Supp. 1232 (*National Union*). The *National Union* court employed dictionary definitions of the word "subcontractor" to construct a broad interpretation of that term as including " 'one that enters into a subcontract and assumes some of the obligations of the primary contractor' " or " 'one who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance.' " (See *Collett, supra*, 64 Cal.App.4th at p. 343.) The *Collett* court found that, even under these broad definitions, the plaintiff's inspector was not a subcontractor. (*Ibid*.)

In this case, Zurich contends the trial court committed reversible error by failing to apply *Collett's* definition of a subcontractor which it characterizes as "the controlling authority in California on this issue." Zurich maintains that undisputed evidence establishes that Bay Foam "took a portion of FMI's contract" by custom fabricating the bullnose components of the EIFS system and that Bay Foam's custom construction or fabrication of the bullnoses was the defective work that primarily caused the damage.

These facts, Zurich contends, bring Bay Foam within the *Collett* definition of a subcontractor, as a matter of law. We disagree for several reasons.

First, the *Collett* court did not expressly nor implicitly adopt any generally applicable definition of the subcontractor term. Instead, it rejected the plaintiff's proposed definitions as overly broad and also concluded that, even under a very broad definition, the inspector in that case was not a subcontractor. (*Collett, supra*, 64 Cal.App.4th at pp. 342-343.) Second, the *Collett* court did not even contemplate whether a supplier of custom fabricated material should be considered a subcontractor for insurance purposes. Third, the trial court in this case found that the fact that a supplier has to fabricate an item that it is asked to provide does not automatically transform that supplier into a subcontractor. This finding is not inconsistent with *Collett*.

Zurich spends significant time discussing cases from other states involving subcontractors who manufactured customized material for construction jobs. At best, this non-binding authority suggests that a supplier can also conceivably be a subcontractor. (See, e.g., *National Union, supra,* 756 F.Supp. at p. 1239.) It does not, however, establish that this California trial court erred by finding that Bay Foam was not subcontractor under the facts presented first to the arbitrator and then again to the trial court pursuant to the parties' express stipulation.

Indeed, Zurich *ignores* the trial evidence that it previously *stipulated* was relevant to the question whether Bay Foam was subcontractor on the FMI job. Although it is not our role to summarize that evidence in the first instance, we note for the record that the evidence submitted to the trial court substantially supports its finding that the arbitrator did make a substantive determination that Bay Foam was not a subcontractor. That evidence included the trial testimony of Zurich's EIFS system expert, Frank Nunes. Nunes appeared at this trial and described for the court the "precoating" process that Bay Foam applied to the bullnoses. Nunes also testified that he provided this same description of the precoating process to the arbitrator and that he now believed the arbitrator "got [it] wrong" by characterizing Bay Foam as a supplier.

18

The stipulated evidence also substantially supports the trial court's independent conclusion that Bay Foam was not a subcontractor. That evidence was not limited to the final award, but also included trial testimony, prior recorded testimony and documentary evidence which established, among other things, that Bay Foam did not possess a subcontractor's license and that it did not execute a subcontract with FMI or any other party. Furthermore Bay Foam's president and FMI's project manager for the Hopyard project both testified that Bay Foam was a supplier and not a subcontractor on the Hopyard project.

For all these reasons, we conclude that Zurich has failed to establish that the trial court committed any reversible error. The record supports the trial court's finding that Bay Foam was not a subcontractor within the meaning of the exception to the exclusion for "your work" in the AIU excess policy. Therefore, the judgment in favor of AIU must be affirmed.

## IV. LEXINGTON'S APPEAL

### A.    *Issues Presented*

The judgment requiring Lexington to reimburse Zurich for a portion of FMI's defense consists of two components: (1) reimbursement for defense fees and costs that Zurich paid to defend FMI (FMI defense fees); and (2) reimbursement for a portion of the prevailing party fee award entered against FMI in the Chawin arbitration which Zurich paid when it settled the Chawin action (Chawin fee award) The court also awarded Zurich prejudgment interest from the date of the Chawin settlement.

On appeal, Lexington challenges every component of this award. It contends the FMI defense fees were excessive, Zurich was not entitled to any reimbursement for the Chawin fee award, and the court should not have awarded prejudgment interest. In addition, Lexington contends that it was prejudiced by an erroneous evidentiary ruling.

### B.    *The FMI Defense Fees*

Lexington contends the FMI defense fee component of the award is excessive because the trial court calculated the cost of the defense by using a beginning date of June

19

9, 2004. Lexington maintains the undisputed evidence establishes that its duty to defend FMI did not arise until December 2005.

"[A]n insurer's obligation of equitable contribution for defense costs arises where, after notice of litigation, a diligent inquiry by the insurer would reveal the potential exposure to a claim for equitable contribution, thus providing the insurer with the opportunity for investigation and participation in the defense in the underlying litigation." (*OneBeacon America Ins. Co. v. Fireman's Fund Ins. Co*. (2009) 175 Cal.App.4th 183, 187.)

In the present case, substantial evidence establishes that Lexington had notice of the Chawin litigation in June 2004.[7] That evidence includes a copy of a June 9, 2004, letter that was addressed to Lexington's agent and signed by an FMI risk manger named Cecilia Plough. The June 2004 letter notified Lexington of the Chawin construction defect claim and forwarded copies of pertinent information which included the summons and complaint in the Chawin action, FMI's certificate of insurance, and the Wentz/FMI subcontract. Substantially similar letters that Ms. Plough sent to Zurich and CNA that same day were also admitted into evidence. Both the Zurich and CNA tender letters contain notations reflecting that copies of these notices were also mailed to Lexington. In addition, the record contains evidence of a December 8, 2005, letter that Plough sent to Lexington regarding the FMI claim. The content of this letter clearly reflects that it was a *retender* of the original notice that FMI sent on June 9, 2004.[8]

---

[7] By expressly finding that Lexington's defense obligation arose in June 2004, the court implicitly found that Lexington had notice of the FMI claim as of that date. The doctrine of implied findings "directs the appellate court to presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings . . . ." (*SFPP, L.P. v. Burlington Northern & Santa Fe Railway. Co.* (2004) 121 Cal.App.4th 452, 462.)

[8] We reject Lexington's illogical contention that the June 2004 letter was "not admitted" as a trial exhibit because it was attached to and admitted into evidence along with the December 2005 letter. The record clearly reflects that the court admitted both letters into evidence without making any preliminary ruling as to which constituted the tender notice.

20

Lexington contends this evidence is not sufficient to establish it received FMI's tender notice in June 2004 because there was no evidence Ms. Plough actually mailed the June 2004 letter to Lexington. We disagree. Ms. Plough was unable to confirm that she mailed the June 2004 tender letter because she died in 2008. However, the testimony of Robert Barwick, FMI's controller and chief financial officer, was sufficient to support a finding that the letter was mailed to Lexington. Barwick testified that he had seen all three of the June 2004 tender letters in FMI's insurance file. Barwick had been Plough's supervisor and was able to authenticate her signature on the June 2004 tender letters. Barwick also testified that he was familiar with Ms. Plough's practices and that he believed she mailed the FMI tender letter to Lexington on June 9, 2004, before she placed a copy of the letter in FMI's file.

Lexington argues the trial evidence established that Lexington never received the June 2004 tender letter and that its first notice of the Chawin action was the December 2005 letter. A former Lexington claims adjuster named Anne Marie Malekos testified that the FMI claim was assigned to her shortly after Lexington received FMI's December 2005 re-tender letter. Malekos did not recall doing anything to investigate whether FMI had tendered its defense prior to December 2005, but she testified that it would have been her practice to search the index for a prior file. In March 2006, Malekos transferred responsibility for the FMI claim to another adjuster named Denise Pincus. Pincus testified that she thought that the December 2005 letter was the first notice of the claim that Lexington had received and she recalled that she had checked the index system to see if an earlier file had been created. However, the claims notes generated by Lexington adjusters who handled the FMI matter do not reflect that either of these witnesses or anybody else attempted to locate a copy of the June 2004 tender letter.

Lexington's evidence that it did not receive notice of the FMI claim until December 2005 was neither dispositive nor undisputed. As the trial court found in its statement of decision, Lexington's evidence did not establish that it conducted any diligent inquiry of its files for an earlier tender notice. Furthermore, Lexington's evidence does not undermine the substantial evidence summarized above which supports

21

the trial court's finding that Lexington received notice of the FMI claim in June 2004. Therefore, Lexington has failed to substantiate its claim that the damages award is excessive as a matter of law.

## C.    *The Chawin Fee Award*

The judgment requires Lexington to reimburse Zurich for part of the Chawin fee award entered against FMI in the Chawin arbitration. The trial court found that Zurich paid more than its share of that defense obligation when it contributed $900,000 to settle the Chawin case. On appeal, Lexington does not dispute that the Chawin fee award was a defense obligation pursuant to a supplementary payment provision in the primary insurance policies. Instead, Lexington offers several reasons why it should not be held responsible for paying any portion of this defense obligation.

First, Lexington contends that its duty to defend FMI terminated on March 28, 2006, when the arbitrator issued his interim award, which was before the arbitrator issued the Chawin fee award. The interim award contained a finding that the damages occurred in 1998, before the 2002 Lexington policy went into effect. According to Lexington, this factual finding established that the FMI claim was not covered by the 2002 Lexington policy and, at that point, Lexington's defense obligation ended.

"The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage. [Citation.]" (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655.) In light of this potentiality requirement, courts have recognized that a defense duty may continue even after entry of a judgment negating coverage if, for example, it is still possible that facts after an appeal and remand could establish coverage for the loss. (*Griffin Dewatering Corp. v. Northern Ins. Co. of New York* (2009) 176 Cal.App.4th 172, 215; *Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890, 903-904 (*Prichard*).)[9]

---

[9] At oral argument before this court, Lexington's appellate counsel argued that *Prichard, supra*, 84 Cal.App.4th 172, was disapproved in *State Farm General Ins. Co. v. Mintarsh* (2009) 175 Cal.App.4th 274 (*Mintarsh*) and that *Mintarsh* confirms that

Here, as the trial court found, "the interim arbitration award was just that—an interim award. . . . It was still subject to finalization and potentially being vacated." Indeed, Lexington's conduct at the time suggests it understood that the coverage matter was not finally resolved by the interim award because it continued to share defense costs with the other primary insurers until the Chawin action settled. Thus, Lexington's defense duty continued after the interim award was entered.

Second, Lexington contends it cannot be required to make an equitable contribution for the Chawin fee award because Zurich failed to establish that it paid any part of that award by making the $900,000 settlement payment. The trial court found that Zurich contributed $213,803.72 toward payment of the Chawin fee award when it should only have had to pay $142,535.81. The question on appeal is whether this finding is supported by substantial evidence.

In its statement of decision, the trial court found that FMI's total liability for Chawin's prevailing party fees and costs in the arbitration case was $427,607.44. That finding is consistent with and supported by the arbitrator's final award. The trial court also found that Zurich paid $900,000 to settle the Chawin arbitration award, that CNA paid $1,775,000, and that Lexington paid nothing. That finding is supported by substantial evidence including the October 2006 settlement agreements and the testimony

---

Lexington is not liable for the Chawin fee award. However, Lexington's counsel failed to acknowledge that the issue upon which these two cases arguably disagree is a different issue than the one we address here.

The question in *Mintarsh, supra,* 175 Cal.App.4th at pages 284-287, was whether an insurer's obligation under a supplementary payment provision extended to costs arising solely from claims that were not even potentially covered under the insurer's policy. Applying the same potentiality requirement that we apply here, the *Mintarsh* court held the insurer in that case had no such obligation, and it declined to follow *Prichard* only to the extent language in that case could be interpreted to support a contrary conclusion. (*Id*. at p. 287.) Nothing in *Mintarsh* supports Lexington's very different contention that an insurer's duty to defend a potentially covered claim terminates upon issuance of an interim award that is still subject to finalization and potentially being vacated. Indeed, the *Mintarsh* court did not consider that question at all.

of Zurich's claims adjuster. These facts establish the evidentiary support for the trial court's conclusion that Zurich and CNA each paid one-half of the Chawin fee award ($427,607.44 divided by 2 equals $213,803.72). Thus, the finding that Zurich is entitled to equitable contribution from Lexington for this payment is supported by substantial evidence.

Finally, Lexington maintains that Zurich is not entitled to contribution because its $900,000 payment was made to settle FMI's bad faith case as well as the Chawin action. According to this theory, Zurich essentially waived its right to obtain equitable contribution for the Chawin fee award by failing to allocate its settlement payment between the Chawin action and the FMI bad faith case. However, Lexington fails to identify any authority for the proposition that an insurer waives its right to equitable contribution under these circumstances. The right of equitable contribution between coinsurers "permits liability for the loss to be allocated among the various insurers without regard to questions of comparative fault or the relative inequities between the insurers." (*Fireman's Fund Ins. Co*. (1998) 65 Cal.App.4th 1279, 1296.)

Furthermore, the factual premise of this argument, that Zurich made the $900,000 payment to settle its own liability for bad faith, is inconsistent with the trial court's findings. In the statement of decision, the court found that Zurich's $900,000 payment to Chawin was contributed on FMI's behalf to settle the Chawin action. This finding was supported by the settlement agreements as well as the testimony of B.W. Radley, the Zurich claims specialist who handled the FMI/Chawin claim and participated in the final settlement of that matter. Radley expressly testified that Zurich did not make this payment to settle a bad faith claim.

Lexington contends that evidence that Zurich actually engaged in bad faith while handling the FMI claim compels the conclusion that it paid the $900,000 to settle the bad faith action. Again though, Lexington simply ignores the fact that the trial court considered all of that evidence and then made extensive findings that Zurich did not engage in any bad faith conduct.

24

**D.**     *Prejudgment Interest*

The judgment awards Zurich prejudgment interest on the award against Lexington from the date of the Chawin settlement. Lexington contends Zurich is not entitled to prejudgment interest in this case because "both liability and damages were disputed and uncertain."

Section 3287 of the Civil Code (section 3287) provides that: " (a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ."

" ' "[T]he certainty requirement of section 3287, subdivision (a) has been reduced to two tests: (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to compute the damages." [Citation.]' [Citation.]" (*Hartford Accident & Indemnity Co. v. Sequoia Ins. Co*., (1989) 211 Cal.App.3d 1285, 1307 (*Hartford*).) Damages are deemed certain or capable of being made certain when the dispute centers on liability issues and there is essentially no dispute "concerning the basis of computation of damages if any are recoverable." (*Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1060.) However, "section 3287 does not authorize prejudgment interest as a matter of law where the amount of damage, as opposed to only the determination of liability, depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor." (*Id*. at p. 1062.)

Here, Lexington contends that damages were uncertain because the parties disputed the tender date and the end date of Lexington's defense obligation and also what formula to use to allocate fees and costs among the three primary insurers. We disagree. Disputes regarding the extent of an insurers' liability or the proper formula to use to allocate liability among multiple insurers are legal questions that do not render damages uncertain because the amount of damages under whatever formula is selected are readily ascertainable by mathematical formula. (*Hartford, supra,* 211 Cal.App.3d at p. 1307.)

**E.**     *Evidence*

Finally, Lexington argues that the trial committed prejudicial error by admitting evidence of a computer generated document that summarized the payments Zurich made in order to defend FMI in the Chawin action. Lexington contends that this summary should have been excluded because Zurich failed to produce it during discovery and did not disclose it to Lexington until the eve of trial.

At trial, Zurich's claim specialist, B.W. Radley, testified that, on July 5, 2011, he generated a report which showed the payments that Zurich had made to defend FMI in the Chawin action. Radley also testified that he verified each payment listed on the report by checking it against other documentary evidence produced in this case. The trial court admitted the payment summary into evidence as Exhibit 116.

The trial court did not abuse its discretion by admitting Exhibit 116 into evidence. The document was admissible because it was a "general compilation of documents that could not be examined individually by the court without great loss of time . . . ." (*Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 293.) Indeed, Lexington expressly concedes that "a document that is created by the witnesses, for the purposes of summarizing business records for trial, is admissible." Furthermore, although Lexington claims this document was wrongfully withheld during discovery, Radley testified he did not create it until July 2011. Even if we could be persuaded that Zurich had some obligation to generate the report on an earlier date, Lexington fails to establish that it was prejudiced by the admission of this document.

Indeed, Lexington's only concrete claim of prejudice is that it could have saved some time and money if it had the document earlier because it would not have paid its own expert to analyze the evidence if it had obtained this summary earlier in the litigation. Frankly, we are not persuaded by this after-the-fact notion. In any event, Lexington does not dispute that it did have access to all of the documentary evidence that was summarized in Exhibit 116 or that this supporting documentation was also admitted into evidence at trial. Under these circumstances, any error associated with the admission of this summary was harmless.

26

## V.  DISPOSITION

The judgments are affirmed.


_____
Haerle, J.


We concur:


_____
Kline, P.J.


_____
Richman, J.